**John T. REUTCKE, Jr., Plaintiff,**

v.

**John J. DAHM, et al., Defendants.**

**No. CV86–L–333.**

United States District Court,
D. Nebraska.

June 15, 1988.

Robert Slovek, Omaha, Neb., for plaintiff.

Susan Ugai, Asst. Atty. Gen., Lincoln, Neb., for defendants.

URBOM, District Judge.

Under the provisions of 28 U.S.C. § 636(b)(1)(B) I referred this case to the United States Magistrate for an evidentiary hearing. The magistrate's report and recommendation followed.

■ I now adopt the report and recommendation of the magistrate and comment only briefly with respect to objections made by each of the parties.

The magistrate has recommended that the plaintiff recover judgment against the defendant Dahm in his individual capacity on the plaintiff's access-to-the-courts claim in the amount of $1.00, costs, and attorney's fees. The plaintiff objects for failure to award substantial compensatory damages and failure to award any punitive damages.

The magistrate's recommendation is a correct one on both scores. There simply has been no evidence of any damage to the plaintiff from his lack of access to the courts. It is true, as the plaintiff points out, that the magistrate rightly said that there is no requirement of "prejudice" to establish a claim, yet says that in connection with damages "the plaintiff has demonstrated no actual prejudice which befell him...." That is not inconsistent. One may establish a claim without any damage, but it does not follow that one is entitled to receive substantial money in compensatory damages when he has shown no damage. "Prejudice" is used in the sense of "damage" by the magistrate at page 21 of his report and recommendation. Nominal damages are the appropriate remedy under the circumstances in this case.

As for punitive damages, the plaintiff argues that Dahm's "abdication of his responsibility was done knowingly and intentionally." The evidence does not support that contention. He was negligent, but not reckless or demonstrating a callous disregard for the plaintiff's rights.

The defendants object to the recommendation that the plaintiff was denied access to the courts in violation of the Constitution arguing, first, that the plaintiff's access to the courts was reasonable when balanced against the interests in maintaining the safety and security of the institution, and, second, that the defendant Dahm is entitled to a qualified good faith immunity under the Eleventh Amendment.

The defendants' argument with respect to the reasonableness of the restriction on the plaintiff's access is rooted in my decision of *Andrews v. Gunter*, CV86–L–50 (Memorandum on Motions for Summary Judgment, dated December 28, 1987). The critical difference between the facts in that case and in this one, as the magistrate noted, is that in the *Andrews* case the evidence without contradiction was that the inmate legal aides, who were provided to help the inmate obtain the materials he needed were well-trained, contrary to the facts of the present case. *Bounds v.*

*Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), stands for the proposition that inmates must either be provided "with adequate law libraries or adequate assistance from persons trained in the law." *Id.* 828. Neither alternative was provided plaintiff at crucial times in this case.

The concept of qualified good faith immunity does not save the defendant Dahm from liability in this case. The law was clear, as I have just quoted from *Bounds.* It must be obvious that in order to have adequate libraries, an inmate must have reasonable access to those libraries and in order to have adequate assistance from persons trained in the law, the persons must be trained in the law. The law was well-settled and a reasonable administrator would have known the requirements of *Bounds v. Smith, supra.*

The plaintiff is entitled to an attorney's fee and I shall give him an opportunity to make a showing regarding the amount of it. A judgment shall not be entered until that issue is resolved.

IT THEREFORE IS ORDERED that the objections of the plaintiff and of the defendants to the magistrate's report and recommendation are denied and the plaintiff shall have 15 days from the date of this order in which to submit to the court one or more affidavits regarding the amount of the attorney's fee, bearing in mind the requirements of our Local Rule 34(D) and *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); thereafter the defendant Dahm may respond within 15 days.

1. I note here that at the outset of the hearing defendant Leroy Akins was dismissed from the suit with prejudice upon the plaintiff's unopposed oral motion to that effect, leaving as defendants John Dahm and Howard Ferguson.

2. Prior to July of 1986 the Diagnostic and Evaluation Center (DEC) and the Lincoln Correctional Center (LCC) were two separate and distinct institutions. On July 23, 1986, however, the two institutions were merged, and the old DEC now comprises the Diagnostic and Evaluation unit of the new LCC. For the time period relevant to this lawsuit the defendant John Dahm was acting superintendent of the old DEC and warden of the new LCC after the merger, a position which he continues to hold. Defendant Howard

## REPORT AND RECOMMENDATION

DAVID L. PIESTER, United States Magistrate.

In the present action [1] the plaintiff, an inmate of the Nebraska Department of Corrections, has brought suit under 42 U.S. C. § 1983 challenging the conditions of his confinement at the Diagnostic and Evaluation Center and the Lincoln Correctional Center.[2] Specifically, he alleges that the policies of the defendants, John Dahm and Howard Ferguson, have deprived him of his constitutional rights to (i) meaningful access to the courts, (ii) freedom from cruel and unusual punishment, and (iii) the equal protection of the laws. The matter was referred to the undersigned magistrate for an evidentiary hearing, which was held on September 28, 1987, followed by a post-hearing briefing schedule. The following constitutes my proposed findings of fact and recommended disposition of this case pursuant to 28 U.S.C. § 636(b)(1)(B).

### I

The plaintiff was originally incarcerated on October 18, 1982, following a conviction for issuing a bad-check, and was confined in the general population of the Diagnostic and Evaluation Center (DEC) until March 2, 1983, when he escaped while on work-release status. Following his subsequent conviction of misdemeanor middle-grade theft in Louisiana, the plaintiff was returned to Nebraska on November 15, 1985, after waiving extradition, and again placed in the general population of the DEC.[3] He

Ferguson was associate superintendent of the old DEC and associate warden of the new LCC during the times relevant to this suit.

3. When plaintiff returned from Louisiana he was accompanied by a letter from A.M. Stroud, First Assistant District Attorney for Caddo Parish, Louisiana, which indicated a request that plaintiff be placed in protective custody as he was to be a prosecution witness in a pending murder trial in Louisiana. (Exhibit 9). However, defendant Ferguson testified that during the plaintiff's "intake" or "admissions" interview, held to determine his placement in the DEC, the plaintiff indicated a desire that he not be placed in protective custody, and that request

remained there until January 3, 1986, following his submission of a written request to be placed in protective custody. (Exhibit 108).[4] At that time he was placed in the segregation unit, or infirmary, of the DEC, and held under administrative confinement. According to institutional policy all inmates, such as the plaintiff, who request protective custody status are initially placed in administrative confinement, presently referred to as immediate segregation. This placement is not imposed as the result of a violation of disciplinary rules. It is instead merely a status indicating an inmate's initial placement in the segregation unit, under which the inmate remains for a brief time, pending a hearing or other investigation to determine whether protective custody status is warranted. (See generally Exhibit 115).

On January 6 a hearing on plaintiff's request for protective custody was conducted by Barry Heinbigner and Ron Reithmuller, who recommended on January 7 that the plaintiff be placed in protective custody for his own safety. (Exhibit 109).[5] On

January 8 defendant Dahm accepted the recommendation and placed the plaintiff on protective custody status. (Exhibit 104).[6] However, although the plaintiff's status changed, he physically remained in the segregation unit at the DEC. The reason for this was clear: the protective custody unit for the Nebraska Department of Corrections, which at that time was housed in the Lincoln Correctional Center, was at full capacity. The plaintiff was accordingly put on a waiting-list, to be transferred to that unit once space was available. However, in the meantime he remained confined in the segregation unit at the DEC, for, as defendant Ferguson emphasized in his testimony, this was the only unit in the DEC at that particular time which had space available and in which prison officials could reasonably assure plaintiff's safety.[7] The plaintiff remained in the segregation unit until January 21, 1986, at which time he was transported to Louisiana, pursuant to a writ of habeas corpus ad testificandum, in order to testify in a murder trial. (Exhibit 8).[8]

was granted, as he did not indicate that he felt any threat from any inmates housed in the general population of the DEC.

4. The plaintiff had received threatening letters for having agreed to serve as a prosecution witness in the trial in Louisiana. He testified that his roommate, William Martin, found out that he was to be a prosecution witness and threatened to inform inmates that the plaintiff was a "snitch" unless the plaintiff's father (purportedly a retired Illinois Attorney General) used his influence to have Martin returned to Illinois. (See Exhibit 109, p. 1, ¶ 4).

5. Initially, on January 6 they had recommended that the plaintiff, who complained that the conditions in the segregation unit were too restrictive, be permitted to withdraw his request for protective custody. However, on January 7 this recommendation was changed. As revealed by Exhibit 109 and the testimony of witnesses Heinbigner and Reithmuller, it was originally thought that the plaintiff was to remain in Nebraska for only one or two days after the hearing, and that his roommate, William Martin, was to leave for the Omaha Correctional Center the next day. However, on January 7 it was subsequently learned that the plaintiff was to remain in Nebraska for at least ten more days before being sent to Louisiana to testify in the murder trial, and his roommate, Martin, would remain in the general population at the DEC during that time. In view of these develop-

ments, the committee determined that the plaintiff's safety could not otherwise be protected, and the recommendation was accordingly changed.

6. Although this original January 8 memo indicated the plaintiff would be placed in protective custody, it also inadvertently stated that the plaintiff was to remain on "administrative detention." (See Exhibit 104, ¶ 2). This inadvertent reference to administrative detention was corrected by a subsequent memo on January 9, which superceded the January 8 memo. (See Exhibit 105).

7. I have no doubt whatsoever that the plaintiff was made well aware of this situation. He testified, however, that he hadn't "the most remote idea" why he was confined in the segregation unit, with all its attendant restrictions, while on protective custody status. This statement is simply not credible. On cross-examination he specifically admitted that he had been told that the protective custody unit was full and that he would have to remain in the segregation unit until a space became available for him.

8. Plaintiff admittedly agreed, before Judge Robert Camp in Lancaster County District Court, to voluntarily return to Louisiana to testify. However, the plaintiff complains that on January 19, just two days before he left, he learned in a

During this time, from January 3 to January 21 of 1986, while the plaintiff was confined in the segregation unit he was admittedly subject to more restrictive conditions than if he had remained in general population. In particular, although inmates in the general population were afforded direct physical access to the law library, the inmates in the segregation unit, including those on protective custody status, had no such access. It is clear that this restriction was related to valid security concerns. As defendants Ferguson and Dahm testified, in order to permit such inmates physical access to the law library, given the pertinent protective and security concerns, it would first be necessary to close off access to the library area by the rest of the inmate population, and would require the presence of at least one guard per inmate who would escort the inmate to the library, remain in the library until his research time was completed, and then escort him back to his cell. Such a practice was seen as prohibitive, both in terms of its added burden on staff and prison resources, and, to a somewhat lesser degree, the attendant restrictions that would have to be placed on the other inmates.[9]

Because such inmates have no physical access to the law library, they are limited to using specifically requested legal materials in their cells.[10] The evidence did not indicate whether any limit was placed on the amount or number of materials which an inmate could have in his cell at any one time.[11] The testimony of defendant Ferguson revealed that if the requested material could not be found in the library at the DEC, it would be possible to obtain the material from the University of Nebraska College of Law pursuant to an "inter-library transfer," although this was admittedly rarely done.[12]

letter from a friend that the trial in Louisiana would not go as scheduled because the defendant was being held in Texas and would first be tried on another matter. Ultimately, the case apparently was not tried as scheduled, and the plaintiff did not testify. He remained confined in the Caddo Parish jail from January 21 until March 3, 1986. Allegedly, he was confined in an 8' by 6' cell with numerous cockroaches, and was only permitted one five-minute shower per week. The plaintiff allegedly did not expect the conditions of confinement to be as a bad as he contends they were. However, there has been no demonstration that the defendants were responsible for the conditions in the Louisiana jail. In fact, the plaintiff has not shown that the defendants are responsible for his having been transferred to and confined there—although he alleges that their policies prevented him from successfully resisting the writ, he has failed to demonstrate any basis, legal or otherwise, by which he in fact could have resisted the execution of it.

9. The inmates in the segregation unit of the Diagnostic and Evaluation unit continue to be denied direct physical access to the library.

10. I note that the evidence was in conflict concerning whether the segregation inmates were limited to using photocopies of requested legal materials or were able to use the actual texts themselves. Al Holloway, the inmate legal aide, testified that, at least for a certain period of time, such access was limited to photocopies of materials. (Holloway Deposition, 12:7–15; 14:2–3; 21:11–17; 24:1–2; 33:4–12; 48:8–18; 53:8–13; 56:4–6). However, defendant Ferguson testified that he believed that such inmates could have possession of the actual texts, although they could also get copies of matters relevant for their particular suits, such as documents or court decisions. I need not resolve this conflict, for whether the inmates had access to the actual texts or were instead limited to photocopies does not affect the analysis concerning plaintiff's claim, as there has been no allegation or demonstration that the photocopying was prohibitively expensive. Cf. Rhodes v. Robinson, 612 F.2d 766, 771 (3rd Cir.1979). See Exhibit 120 (providing for photocopying at the institution's expense for inmates having no money on account).

11. In their brief the defendants indicate, however, that while the plaintiff was confined in the protective custody unit he was limited to two volumes at any given time. (Defendants' Pre-Trial Brief at 12).

12. On rebuttal, the plaintiff alleged that he had never heard of such an inter-library transfer, and that it had never been suggested to him as a possibility in obtaining needed materials for his medical malpractice claim in Louisiana. He also testified that he had requested Al Holloway to obtain Louisiana statutory material from the UNL library, and that Holloway told him he couldn't get it. Al Holloway recalled that he may have seen the plaintiff concerning his medical malpractice claim, and although the request for Louisiana statutory materials did not sound familiar to him, he seemed to recall that on one occasion he was unable to provide the plaintiff with the materials he requested. (Holloway Deposition, 41:20–42:7; 47:18–48:3; 49:22–50:8). Although the inter-library transfer

The established policy for obtaining legal materials was by submitting an interview request form to the inmate legal aide, Al Holloway, who was sent over from the LCC and served the entire population of the DEC, consisting of approximately 250 to 280 inmates, including the 16 inmates housed in the segregation unit. The policy provided that inmates in the DEC were able to see a legal aide on Tuesdays and Thursdays, from 1 p.m. to 3 p.m., and, apparently, at other times by special request. (Exhibit 1). Al Holloway generally visited inmates in the DEC three times per week. (Holloway Deposition, 10:20–11:9; 34:13–37:20; 46:13–47:1).

During January of 1986 Al Holloway visited the plaintiff three times concerning requests for legal assistance, (Exhibits 101, 102, & 103), once for thirty minutes, and the other two times for about five minutes each. In addition, the plaintiff testified that he had requested to see Holloway on two other occasions, but was unable to see him, perhaps due to Holloway's busy schedule. The plaintiff testified that he sought Holloway's assistance in order to (i) challenge his continued confinement in the segregation unit, (ii) pursue a medical malpractice claim arising in Louisiana, and (iii) resist the writ of habeas corpus ad testificandum after learning that he would not testify because the murder trial in Louisiana was to be delayed.

The evidence revealed, and the defendants acknowledged, that no formal training program exists for the inmate legal aides at the LCC, and their work is not supervised by an attorney. (See Holloway Deposition, 10:15–19; 53:19–54:6; 57:25–58:7). The only legal knowledge possessed by such aides comes from their varying degrees of individual exposure to law and the legal process. Although Al Holloway had 200 credit hours from Southeast Community College (including some "business law"), he had taken no courses in legal writing or research, and did not consider his course-work to have included any "legal or paralegal training." His training at the LCC was limited to that which he has managed to "pick up" while on the job, (Id., 3:16–5:16; 44:24–45:17), and he had no other training or experience to qualify him to assist other inmates with legal problems. Whatever direct supervision there was for the inmate legal aides was provided by the librarian, Ann Nichols. Ms. Nichols is not an attorney, and there is no indication that she has had any formal legal training. (Holloway Deposition 7:13–20; 8:8–21). Dennis Bakewell, then an assistant superintendent of the DEC, was an attorney and member of the Nebraska State Bar, but Mr. Bakewell did not supervise the work of the legal aides. (Id., 7:22–8:4). It appears that the only form of advice the inmate legal advisors had from persons trained in the law came from private attorneys whom some of the senior legal aides contacted on an informal, ad hoc basis. (Id., 45:18–4; 54:7–55:3).

In addition, while confined in the DEC segregation unit the plaintiff was denied certain privileges which he would have otherwise enjoyed if he had been housed in the protective custody unit in the Lincoln Correctional Center. Specifically, the Administrative Regulations generally provided that inmates on protective custody status were to be permitted television and radio in their cells. (See Exhibit 116, p. 7).[13] However,

---

may have been a possible alternative, there has been no demonstration that either Al Holloway or any of the other inmate legal aides were aware of such a procedure.

**13.** I note here that the plaintiff also contends that he was denied the same telephone and exercise privileges as afforded to those inmates confined in the protective custody unit. He has, however, failed to demonstrate any credible support for these contentions.

The Administrative Regulations on which the plaintiff relies do indicate that protective custody inmates are to receive "telephone privileges."

(See Exhibit 116, p. 8). There was, however, no evidence presented demonstrating what the policy or procedure was for the placing of phone calls in the protective custody unit. With respect to the DEC segregation unit, defendant Ferguson testified that because there were no telephones in the housing units in the DEC during January of 1986 inmates were permitted to place calls for emergencies and legal matters, but only after properly submitting an interview request form to their case manager. The only evidence plaintiff presented concerning the denial of telephone privileges allegedly occurred when he purportedly wished to place a "legal

as defendants Ferguson and Dahm testified, the protective custody inmates housed in the DEC at this time were specifically exempted by Director Gunter from this provision.[14] The reason for this was clear: due to the DEC's primary function as the initial classification institution for the department, most inmates generally do not remain housed there for any great length of time, usually at most two or three months. Accordingly, when the DEC was originally designed and built it did not have the type of wiring or hook-ups (for cable or outdoor antennas) necessary to permit inmates to use televisions and radios in their cells.[15]

Following the plaintiff's return from Louisiana on March 3, 1986 he was again placed in the DEC, this time in C unit of the general population. Although the plaintiff was technically still on protective custody status, he was inadvertently placed in general population due to the fact that the protective custody unit was again full. Subsequently, on March 13 the plaintiff was moved to B unit, a segregated unit within the general population, until April 14, at which time he was finally transferred into the protective custody unit, where he remained until his parole on September 22, 1986.

As the testimony of defendant Ferguson revealed, although the plaintiff had direct physical access to the law library from the 3rd to the 13th of March while he was in C

unit of the general population, he was again denied physical access to the library both while in B unit, from March 13 to April 14, and while in the protective custody unit, from April 14 to September 22, 1986. While in the protective custody unit the plaintiff had access to the inmate legal aide assigned to assist the 48 inmates in that unit. Again, however, there was no evidence whatsoever to indicate that the inmate legal aide had any type of legal or paralegal knowledge or training, and there was nothing to indicate that his work was supervised by an attorney or even a trained paralegal. The plaintiff testified that during this time he wished to further pursue his medical malpractice claim in Louisiana, and, in addition, wished to assist two other inmates pursue their legal actions in his capacity as "inmate representative."

## II

### Access to the Courts

In *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 1498, 52 L.Ed.2d 72 (1977) the Supreme Court expressly held that "the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." (footnote omitted). The court

call" in order to resist being transported to Louisiana pursuant to the writ of habeas corpus ad testificandum. Although he contends that he did send interview request forms to a Captain Peck as well as to his case manager, Theresa Mulkey, I find his testimony to lack credibility. Theresa Mulkey testified that, as a matter of institutional policy, as plaintiff's case-worker she would have been made aware of any such requests to use the telephone, and that she was never informed of any such request by plaintiff. Consequently, I find that the plaintiff has failed to demonstrate his claimed denial of telephone privileges.

Likewise, the plaintiff has failed to demonstrate his claimed denial of exercise privileges. Defendant Ferguson testified that protective custody inmates housed in the DEC segregation unit were given the opportunity of going to the gym for one hour each day, five days per week. He emphasized that, for protective reasons, protective custody inmates would be sent only with

other protective custody inmates, but only so long as there were no conflicts or problems between the two individuals. He specifically indicated that protective custody inmates would at no time be sent with those on disciplinary segregation, for obvious security and protective reasons. The plaintiff's testimony to the contrary is again lacking in credibility.

**14.** Given this specific exemption, it appears that any due process claim which the plaintiff would have sought to raise concerning this matter would be without merit.

**15.** Defendant Ferguson testified that after March of 1986, when the protective custody unit was transferred from the old LCC to the DEC, the maintenance staff, after two or three weeks of work, made the appropriate modifications and installed additional outlets in the protective custody unit, so that these inmates are now able to use radios and televisions in their cells.

noted that while providing access to an adequate law library may be one acceptable method of assuring meaningful access to the courts, it is not the only one.

Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time basis, and the use of full-time attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.

430 U.S. at 831, 97 S.Ct. at 1499. Thus, states are not necessarily foreclosed from implementing alternative means to shoulder their affirmative obligation. Further, the Court stated that an adequate legal access program need not necessarily include any particular, specific element or component, at least so long as the program, as a whole, complies with constitutional standards. *Id.* at 832, 97 S.Ct. at 1500.[16]

Although not strongly argued, the defendants initially appear to contend that the plaintiff himself is unable to challenge the constitutionality of the regulations restricting access to the law library, for he has failed to show the requisite "prejudice." The plaintiff has in fact failed to demonstrate any harm caused by his inability to have direct physical access to the law library while in the segregation unit. The evidence revealed that the plaintiff did have direct physical access to the law library for a period totaling over two months (from November 17, 1985 to January 3, 1986 and from March 3 to 13 of 1986) while he was housed in the non-segregated units of the general population at the DEC and LCC. In addition, even with the assistance of present counsel, the plaintiff has failed to reveal to the court any meritorious claim which he has "lost" because of any inability to obtain the necessary legal research materials.

Although the plaintiff testified that he once had a valid medical malpractice claim in Louisiana, he has at no time demonstrated that this claim, if valid, is in fact time-barred because the statute of limitations has expired. Plaintiff further failed to demonstrate any basis, legal or otherwise, by which he could have resisted the writ of habeas corpus ad testificandum. Nor has he shown that his inability to obtain access to the law library or advice from a person trained in the law harmed his ability to challenge his initial confinement in the segregation unit while awaiting an opening in the protective custody unit. *See Calloway v. Fauver*, 544 F.Supp. 584 (D.N.J.1982) (upholding as constitutional the plaintiffs' involuntary confinement in the protective custody unit where markedly fewer privileges were available). Finally, as the Eighth Circuit has recently held, an inmate representative whose own access to legal materials is impaired has no standing to raise an "access to the courts" claim on behalf of the inmates he represents unless it is demonstrated that the other inmates are for some reason unable to raise their own challenge. *Flittie v. Solem*, 827 F.2d 276, 279–80 (8th Cir.1987). No such inability was either alleged or demonstrated in the present case. In addition, the plaintiff has failed to demonstrate any merit to the substantive claims which he sought to raise on behalf of the other inmates, thereby further failing to demonstrate any resulting prejudice.

Any reliance the defendants wish to place upon such a "prejudice" requirement, however, is fundamentally misplaced. The Court in *Bounds* nowhere mentions any

---

**16.** The Court, in fact, "encourage[d] local experimentation," 430 U.S. at 832, 97 S.Ct. at 1500, after observing:

Legal service plans not only result in more efficient and skillful handling of prisoner cases, but also avoid the disciplinary problems associated with writ writers ... Independent legal advisors can mediate or resolve

administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly.

*Id.* at 831, 97 S.Ct. at 1500.

such requirement. The reason behind this is intuitively clear: many inmates, unversed in the law as they are, are unable to know they even have a colorable claim, let alone how to frame it properly as a cause of action, unless they first have access to adequate legal resources or advice. *See id.,* 430 U.S. at 824–25, 97 S.Ct. at 1496; *Walters v. Thompson,* 615 F.Supp. 330, 338 (N.D.Ill.1985). As the Fourth Circuit has observed,

> Because an inmate is unable to discover his rights when library access or other access to the law is denied him, any complaint rightly alleging a present denial of access to a library or other assistance states a valid claim for equitable relief. It is unfair to force an inmate to prove that he has a meritous claim which will require access until after he has had an opportunity to see just what his rights are. Not only unfair, it is jurisprudentially unnecessary.

*Harris v. Young,* 718 F.2d 620, 622 (4th Cir.1983). It is also jurisprudentially unsound. The Supreme Court has " 'constantly emphasized' " that "habeas corpus and civil rights actions are of " 'fundamental importance ... in our constitutional scheme' because they directly protect our most valued rights." *Bounds,* 430 U.S. at 827, 97 S.Ct. at 1498 (*quoting Johnson v. Avery,* 393 U.S. 483, 485, 89 S.Ct. 747, 749, 21 L.Ed.2d 718 (1969)). Such prisoner petitioners "are the first line of defense against constitutional violations." *Id.* at 828, 97 S.Ct. at 1498. As such, the constitutional right of access concerns not so much the allegations contained in the complaint which is submitted, but rather the petitions and civil actions which the inmate did *not* file, as well as allegations *left out* of matters that were filed, due to the inadequate access to legal materials or advice. *Harris v. Young,* 718 F.2d at 622; *see also Boulies v. Ricketts,* 518 F.Supp. 687, 689 &

n. 4 (D.Colo.1981). Thus, where the plaintiff sufficiently alleges that the state has failed to meet its affirmative obligation under *Bounds*—by either providing an adequate law library or adequate assistance from persons with legal training—the plaintiff need make no showing of actual prejudice.

To be sure, the term "prejudice" is routinely utilized in decisions on access-to-court claims. It is, however, rarely, if ever explained as a required element of the plaintiff's prima facie case. My reading of the cases leads me to conclude that in order to prevail on such a claim, as part of the plaintiff's case, he must prove either (a) the defendants' system of providing access to the courts is deficient under *Bounds;* or (b) event though the defendants' *system* of providing access to the courts may be adequate under *Bounds,* in the plaintiff's particular case specific acts, omissions or events caused by the defendants resulted in the plaintiff being denied adequate access to the courts, to his actual prejudice in asserting or defending a specific claim. *See, e.g., Tyler v. Black,* 811 F.2d 424, 430 (8th Cir.1987); *Williams v. Wyrick,* 747 F.2d 1231, 1232–33 (8th Cir.1984). In this case, because the plaintiff has demonstrated that the system of providing access to the courts in place at the DEC and LCC during the relevant time was not in compliance with *Bounds,* no showing of actual prejudice is required.

The defendants contend that they have satisfied their affirmative constitutional duty. They assert that the library at the Diagnostic and Evaluation Center contains adequate materials, and that the inmates are provided further assistance from inmate "legal aides." [17] It is undisputed, however, that inmates in the segregation and protective custody units were, due to security considerations, not permitted any

---

**17.** The defendants also seek to rely upon the fact that plaintiff has been appointed counsel in certain of his cases. (Defendant's Pre–Trial Brief at 5). As the Court noted in *Bounds,* since the constitutional right of meaningful access is concerned with "protecting the ability of an inmate to prepare a petition or complaint" at the outset, it is irrelevant that counsel is ap-

pointed in some cases for prisoners whose claims survive after an initial review by courts. 430 U.S. at 828 n. 17, 97 S.Ct. at 1498 n. 17 (*quoting Wolff v. McDonnell,* 418 U.S. 539, 576, 94 S.Ct. 2963, 2984, 41 L.Ed.2d 935 (1974)). See also *Campbell v. Miller,* 787 F.2d 217, 229–30 n. 22 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1987).

physical access to this library. In addition, the inmate "legal aides" to which they do have access have no formal legal training. Just as in *Rich v. Zitnay,* 644 F.2d 41, 43 (1st Cir.1981) and *Ramos v. Lamm,* 639 F.2d 559, 584 (10th Cir.1980), the defendants have pointed to nothing in the record to demonstrate the training or competence of the "legal aides" assigned to provide assistance to the inmates housed in the protective custody unit. The plaintiff argues that, given the absence of legally trained advisors at the Lincoln Correctional Center, the regulation prohibiting physical access to the law library impermissibly burdens his right of access to the courts. I agree.

As the Ninth Circuit has observed, "the great weight of the authority in the courts of appeals" provides that where inmates are denied physical access to the law library, the state must provide research assistance in the form of persons trained in the law. *Toussaint v. McCarthy,* 801 F.2d 1080, 1110 (9th Cir.1986), *cert. denied,* 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). *See also Corgain v. Miller,* 708 F.2d 1241, 1247–50 (7th Cir.1983); *Holt v. Pitts,* 702 F.2d 639, 640–41 (6th Cir.1983) (per curiam); *Rich v. Zitnay,* 644 F.2d at 43; *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cert. denied,* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979). The reason behind this is readily evident. Where an inmate is simply permitted to use specifically requested legal books in his cell, he has no meaningful opportunity to conduct legal research, to explore the legal remedies available to him.[18] For, as the Ninth and Fourth Circuits have observed,

[l]egal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Toussaint,* 801 F.2d at 1110 (*quoting Williams v. Leeke,* 584 F.2d at 1339).[19]

In support of their position the defendants cite several cases in which courts have upheld as constitutional policies which altogether prohibit physical access to library facilities but instead permit inmates to use requested legal materials in their cells. In doing so, the defendants rely heavily upon *Bell v. Wolfish,* 441 U.S. 520, 540–41 n. 23, 99 S.Ct. 1861, 1874–75 n. 23, 60 L.Ed.2d 447 (1979), in which the Court stated that security considerations "are peculiarly within the province and professional expertise of corrections officials, and in the absence of substantial evidence in the record to indicate that officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." *See also O'Lone v. Estate of Shabazz,* 482 U.S. 342, 347–48, 107 S.Ct. 2400, 2403–04, 96 L.Ed.2d 282 (1987); *Williams v. Leeke,* 584 F.2d at 1339.

---

**18.** As the Ninth Circuit has noted, any such system necessarily requires the inmate to know in advance which volumes he will need to review, and this in turn results in a process of ordering and returning books which drastically and unacceptably prolongs legal research. *Toussaint,* 801 F.2d at 1109 n. 30.

**19.** *Cf. Campbell v. Miller,* 787 F.2d 217, 225–30 (7th Cir.1986), *cert. denied,* 479 U.S. 1019, 107 S.Ct. 673, 93 L.Ed.2d 724 (1987), a case cited by the defendants, in which the court found no violation of the plaintiff's rights even though he, as a highest level maximum-security federal inmate, had no access to trained legal assistance,

and was prohibited from having physical access to the larger, more complete law library used by general-population inmates in Marion, Illinois. This was because the plaintiff had direct physical access to, and adequate time to spend in, a separate, smaller library within the maximum-security housing unit, which was "designed to facilitate the initial steps of legal research, *viz.,* the formulation of tentative theories and the notation of materials needed to be consulted." *Id.* at 227. From this research the plaintiff could adequately determine the necessary case citations and which two law books he would request from the main library at any one time.

The defendants reliance upon these cases is misplaced. With but one exception,[20] in each of these cases the inmates had adequate access to persons trained in the law, a critical factor absent in the present case. *See, e.g., Tyler v. Black,* 811 F.2d 424, 429 & n. 3 (8th Cir.1987) (inmates in segregation unit could meet with inmate "law clerks" who had paralegal training and were supervised by an attorney and paralegal instructor); *Williams v. Wyrick,* 747 F.2d 1231, 1232 (8th Cir.1984) (per curiam) (the 23 death-row inmates at the Missouri State Penitentiary receive assistance from "two inmate paralegals and one 'runner' who procure law books upon request; copy portions of legal materials, and research legal questions"); *Lovell v. Brennan,* 566 F.Supp. 672, 697 (D.Maine 1983) (inmates in administrative segregation and protective custody (i) "receive paralegal services from the inmate advocate, who visits their units weekly and has the adequate resources of the [prison law] library at his disposal, (ii) receive assistance in obtaining legal materi-

als and referrals for legal assistance from the "Office of Advocacy," and (iii) receive legal assistance from person serving the newly-created position of full-time advocate), *aff'd,* 728 F.2d 560 (1st Cir.1984); *Frazier v. Ward,* 426 F.Supp. 1354, 1371 (N.D.N.Y.1977) (inmates in segregation unit had available a new "Prisoners' Legal Services," with a substantial number of lawyers, from which to obtain assistance).

As the Court made clear in *Bounds,* the Constitution requires, *at a minimum,* that inmates either be provided "with adequate law libraries or adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498 (footnote omitted).[21] However, the Court also indicated that inmates have no absolute right to any particular form of legal assistance. *See id.* at 832–33, 97 S.Ct. at 1500–01.[22] As the Court expressly observed, practical considerations, such as economic factors, may be weighed in choosing the *methods* by which meaningful access is provided; yet, the

---

20. In *Wojtczak v. Cuyler,* 480 F.Supp. 1288, 1300–01 (E.D.Pa.1979), the court, relying upon *Bell, supra,* deferred to the judgment of prison officials concerning internal security and refused to require the plaintiff be permitted physical access to the law library. The plaintiff there, like the present plaintiff, was housed in a maximum-security unit at his own request for his own protection, and was not permitted to obtain assistance from the paraprofessional law clinic available to general population inmates. 480 F.Supp. at 1295–96. However, in sharp contrast to the present case, the facts reveal that the plaintiff in *Wojtczak* was expressly willing to accept the opportunity of doing legal research in his cell in lieu of being transported to the law library. *Id.* at 1296. Moreover, the court's opinion in *Wojtczak* does not indicate any dissatisfaction on the plaintiff's part with his inability to meet with members of the paraprofessional legal clinic. Accordingly, the *Wojtczak* court was not faced with the situation presented here, in which the inmate is not content to merely remain in his cell and do legal research without the aid of a trained legal advisor.

21. There is no requirement, however, that the state provide both trained legal assistance and adequate access to law libraries, *Lindquist v. Idaho State Bd. of Corrections,* 776 F.2d 851, 855 (9th Cir.1985); *Hooks v. Wainwright,* 775 F.2d 1433, 1437 (11th Cir.) (reversing district court's holding that *any* acceptable plan to ensure Florida prisoners with meaningful access *must* include a provision for the assistance of counsel),

*reh'g denied,* 781 F.2d 1550 (11th Cir.1985) (en banc), *cert. denied,* 479 U.S. 913, 107 S.Ct. 313, 93 L.Ed.2d 287 (1987); *Harrington v. Holshouser,* 741 F.2d 66, 70 (4th Cir.1984), at least so long as either method alone is found adequate to satisfy the "meaningful assistance" requirement of *Bounds, Cruz v. Hauck,* 627 F.2d 710, 721 (5th Cir.1980). *But cf. Cody v. Hillard,* 599 F.Supp. 1025, 1060–61 (D.S.D.1984) (concluding that, under the circumstances, South Dakota must, in addition to providing physical access to an unquestionably adequate law library, afford inmates a reasonable form of assistance from persons trained in the law), *rev'd on other grounds,* 830 F.2d 912 (8th Cir.1987) (en banc).

22. For this reason, the plaintiff has no absolute constitutional right of direct physical access to the law library. See, e.g., *Cepulonis v. Fair,* 732 F.2d 1, 4 (1st Cir.1984); *Williams v. Leeke,* 584 F.2d at 1339. The fact that some segregated inmates have no such direct physical access due to valid security concerns, while such access is afforded to other inmates who are not necessarily similarly situated, does not violate equal protection so long as the means by which the segregated inmates are afforded access to the courts is sufficiently "meaningful" to satisfy the constitutional minimum. See, e.g., *Toussaint,* 801 F.2d at 1110; *Williams v. Leeke,* 584 F.2d at 1339; *Nadeau v. Helgemoe,* 561 F.2d 411, 417–18 (1st Cir.1977); *Knop v. Johnson,* 667 F.Supp. 467, 496 (W.D.Mich.1987); *Kendrick v. Bland,* 586 F.Supp. 1536, 1550 (W.D.Ky.1984); *Lovell v. Brennan,* 566 F.Supp. at 696–97.

cost of protecting a fundamental constitutional right cannot justify its total denial. *Id.* at 825, 97 S.Ct. at 1496. Analogously, although security concerns may be considered in choosing the method by which the mandate of *Bounds* is satisfied, security considerations which render a *particular* method prohibitive cannot be relied upon to justify the non-implementation of other methods which have been neither argued nor demonstrated to create an unacceptable risk to institutional security. That is, if the defendants conclude that economic and security considerations render impracticable the option of permitting inmates housed in the segregation unit to have direct physical access to the law library, they cannot rely upon this justification to likewise deny these inmates access to advisors trained in the law. See, e.g., *Knop v. Johnson,* 667 F.Supp. 467, 496 (W.D.Mich. 1987).

The simple fact is that if the state denies a prisoner direct physical access to a law library, the state must provide that prisoner, no matter what his status, with assistance by trained, skilled, and independent legal personnel. See, e.g., *Toussaint,* 801 F.2d at 1110 (requiring California to provide to legal counsel or trained legal assistants to administrative segregation inmates having no direct physical access to a law library); *Walters v. Thompson,* 615 F.Supp. 330, 338–39 (N.D.Ill.1985) (finding constitutional violation where segregated inmates had no direct physical access to a law library and inmate law clerks assigned to assist them had "little or no legal experience, formalized training, or supervision by attorneys"); *Johnson v. Galli,* 596 F.Supp. 135, 138 (D.Nev.1984) (finding county jail's policy of denying pretrial detainees physical access to law library unconstitutional where no legal assistance was provided); *Kendrick v. Bland,* 586 F.Supp. 1536, 1552,

1555 (W.D.Ky.1984) (requiring Kentucky to provide reasonable opportunity for confidential communication with persons trained in the law where inmates in restricted confinement had no physical access to the law library and inmate legal aides were insufficiently trained); *Martino v. Carey,* 563 F.Supp. 984, 993, 1003–04 (D.Or.1983) (finding county jail's policy of generally denying prisoners and pretrial detainees physical access to law library unconstitutional where no legal assistance was provided); *Canterino v. Wilson,* 562 F.Supp. 106, 110 (W.D.Ky.1983) (finding unconstitutional program in which inmates were generally unable to go to the law library and the inmate legal aides had insufficient paralegal training).

■ The Court in *Bounds* recognized as one acceptable alternative the use of trained inmates as paralegal assistants, working under the supervision of an attorney. 430 U.S. at 831, 97 S.Ct. at 1499. These subsequent lower federal court cases have made clear that the use of untrained and inadequately supervised inmate assistants is constitutionally unacceptable. *See also Harrington v. Holshouser,* 741 F.2d 66, 69–70 (4th Cir.1984). As indicated above, the defendants have pointed to nothing in the record to demonstrate the training or competence of the "legal aides" assigned to provide assistance to the inmates housed in the segregated units of the LCC. As a consequence, I find that the plaintiff's constitutional right of access to the courts has been violated.[23]

### Equal Protection and Cruel and Unusual Punishment

The plaintiff next contends that his rights under the Equal Protection Clause of the Fourteenth Amendment and the Eighth Amendment were violated. In sup-

23. I am aware of the recent decision in *Andrews v. Gunter,* CV86–L–50 (D. Neb., unreported memorandum of decision dated December 28, 1987) (Urbom, J.), in which summary judgment was granted on a similar "access to the courts" claim against the plaintiff, a protective custody inmate housed in the Adjustment Center at the Nebraska State Penitentiary. In *Andrews* the plaintiff argued that the inmate legal aides were untrained, but did nothing to rebut the defendant's evidence upon which the court concluded that the legal aides were "well-trained." Slip. op. at 12. The facts of that case were not presented to the undersigned magistrate. Consequently, I am unable to reach any conclusion on the comparability of the evidence in the two cases regarding training.

port, he points out that after he was granted protective custody status on January 8 he continued to be confined in the segregation unit of the DEC until January 21 while awaiting an opening in the protective custody unit in the LCC. Consequently, during these fourteen days the plaintiff was denied the privilege of having radio and television in his cell, privileges which he would have enjoyed had he been housed in the protective custody unit. He similarly complains that his confinement in the segregation unit—for reasons stemming from protective custody considerations, rather than for having violated any institutional disciplinary rule—constituted cruel and unusual punishment in violation of the Eighth Amendment. These contentions are without merit.

■ In order for an inmate to succeed on such an equal protection claim he must show that the treatment he received was substantially and invidiously dissimilar to that received by other inmates. *Lyon v. Farrier*, 730 F.2d 525, 527 (8th Cir.1984); *Burns v. Swenson*, 430 F.2d 771, 778 (8th Cir.1970), *cert. denied*, 404 U.S. 1062, 92 S.Ct. 743, 30 L.Ed.2d 751 (1972). This the plaintiff has not done.

The denial of radio and television privileges for such a relatively short duration does not amount to substantially dissimilar treatment. Nor was this denial invidious, or offensively unfair, but was instead rationally related to legitimate state interests. As discussed earlier, because the protective custody unit was fully occupied, the plaintiff remained in the segregation unit, for this was the only unit in the DEC at that time with a vacancy in which prison officials could reasonably assure plaintiff's safety. The DEC serves primarily as the initial classification institution for the Nebraska Department of Corrections. As a consequence, most inmates generally do not remain housed there for any great length of time. Accordingly, when the DEC was originally designed and built it did not have the wiring or hook-ups necessary to permit inmates to use televisions and radios in their cells.

As other courts have made clear, administrative convenience and expense are rational state interests which can be relied upon to justify restrictions on privileges enjoyed by inmates in protective custody. See, e.g., *Lovell v. Brennan*, 566 F.Supp. at 692; *Nadeau v. Helgemoe*, 561 F.2d 411, 417 (1st Cir.1977). Thus, as in *Andrews v. Gunter*, it is evident that the difference in treatment were "rationally related to the interests of administrative convenience, expense, and security." CV86-L-50 (D. Neb., unreported memorandum of decision dated December 28, 1987) (Urbom, J.), slip op. at 9 (finding no violation of equal protection where protective custody inmate was confined in the Adjustment Center). As the Fourth Circuit has recently held,

> conditions imposed on prisoners requesting protective custody less favorable than those afforded the general prison population do not give rise to a meritorious claim of denial of equal protection or a denial of due process where the restrictions bear a rational relationship to the protection of the prisoner requesting such relief and where the restrictions are not so onerous as to jeopardize his health.

*Taylor v. Rogers*, 781 F.2d 1047, 1050 (4th Cir.1986) (per curiam).

■ Further, the placement in protective segregation for an inmate who has not violated prison rules does not violate the Eighth Amendment, at least so long as the accompanying denial of benefits is rationally related to the security and protective concerns which warranted the protective custody status in the first place. *Taylor v. Rogers*, 781 F.2d at 1050 (rejecting "least restrictive means" analysis employed in *Wojtczak v. Cuyler*, 480 F.Supp. 1288, 1303–07 (E.D.Pa.1979), where prison housed a single protective custody inmate). See also *Allgood v. Morris*, 724 F.2d 1098, 1101 (4th Cir.1984); *Shrader v. White*, 761 F.2d 975, 981 (4th Cir.1985); *Calloway v. Fauver*, 544 F.Supp. 584, 598–99 (D.N.J. 1982); *Andrews v. Gunter*, CV86-L-50, (D.Neb.1987) [1987 WL 54372] (Urbom, J.), slip op. at 7–8 (finding no cruel and unusual punishment where protective cus-

tody inmate was confined in the Adjustment Center).

As the discussion above demonstrates, the temporary and relatively minor restrictions which the plaintiff was required to endure were rationally related to security concerns. The fact that plaintiff was denied television and radio privileges within his cell from the 3rd to the 21st of January simply did not "involve the wanton and unnecessary infliction of pain," nor was it "totally without penological justification." *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 2399, 69 L.Ed.2d 59 (1981). These claims should accordingly be denied.

### Liability

By its express terms, § 1983 requires that each defendant be a "person" whose actions, under color of state law or usage, deprive or cause a deprivation of the plaintiff's rights under the Constitution or laws of the United States.

A defendant may be personally involved in a constitutional deprivation within the meaning of 42 U.S.C. § 1983 in several ways. The defendant may have directly participated in the infraction.... [In addition, a] supervisory official may be liable because he or she created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue....

*Williams v. Smith,* 781 F.2d 319, 323 (2d Cir.1986).

■ The plaintiff has demonstrated a sufficient basis to hold defendant Dahm liable. As the Eighth Circuit has made clear, chief executive officers of penal institutions, such as "[a] prison warden can be held liable for policy decisions which create unconstitutional conditions." *Martin v. Sargent,* 780 F.2d 1334, 1338 (8th Cir.1985); *Ouzts v. Cummins,* 825 F.2d 1276, 1277 (8th Cir.1987) (per curiam). As defendant Dahm acknowledged, he was ultimately responsible for the policy of the institution concerning access to legal materials and assistance.

■ The plaintiff, however, has failed to demonstrate a sufficient basis on which to hold defendant Ferguson liable. Of course, the mere fact that defendant Ferguson's position is subordinate to the warden in the institutional hierarchy does not insulate him from liability. *See, e.g., Miranda v. Munoz,* 770 F.2d 255, 259 n. 2 (1st Cir. 1985). Liability in any given case is determined by pinpointing those persons in the decisionmaking chain responsible for making the unconstitutional policy decision. *Cf. id.* at 260. Defendant Ferguson, as associate superintendent and associate warden, had responsibility for a substantial amount of input into the formulation of policy for the institution. However, it is also evident that he did not have final decision-making authority with respect to the policy concerning the ability of the segregation unit inmates to obtain information on their legal rights, whether that be in the form of direct physical access to the law library or assistance from persons trained in the law.

There was no evidence presented to indicate that defendant Ferguson had any authority whatsoever concerning the training and supervision of the inmate legal aides. In addition, defendant Dahm testified that he was responsible for initiating the present change under which the protective custody inmates in the Diagnostic and Evaluation unit are permitted direct physical access to the law library, and that no one below him in the institutional hierarchy could have made such a change without his approval. It is thus clear that ultimate responsibility for the policy rests upon defendant Dahm. Under the circumstances the plaintiff has failed to demonstrate a sufficient basis on which to hold defendant Ferguson liable for the unconstitutional policy. *See West v. Atkins,* 815 F.2d 993, 996 (4th Cir.) (no indication that defendant state officials had the authority to "override" the medical treatment decision of the prison physician), *cert. granted,* —— U.S. ——, 108 S.Ct. 256, 98 L.Ed.2d 214 (1987); *see also Hayes v. Vessey,* 777 F.2d 1149, 1154 (6th Cir.1985).

### Good Faith Defense

Qualified, or good faith, immunity is an affirmative defense, one which the defen-

dants have the burden of pleading and proving. See, e.g., *Bauer v. Norris,* 713 F.2d 408, 411 n. 6 (8th Cir.1983); *Buller v. Buechler,* 706 F.2d 844, 850 (8th Cir.1983); S. Nahmod, *Civil Rights and Civil Liberties Litigation,* § 8.01. at 230 (1979). It provides a defense from money damages to individual officials for actions which were objectively reasonable and not in violation of clearly established constitutional law. *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978); *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982).

■ In determining the good faith of defendant Dahm in authorizing and implementing the restrictive policy which precluded protective custody inmates from having physical access to the law library or, in the alternative, access to legal advice from persons trained in the law, a determination must be made as to whether the constitutional law prohibiting such action was clearly established at the time. *Anderson v. Creighton,* 483 U.S. 635, ——, 107 S.Ct. 3034, 3038–40, 97 L.Ed.2d 523 (1987). Although it is not necessary that the very action in question have previously been determined to be unconstitutional, the unconstitutionality of the conduct must be apparent from preexisting law. *Id.*

As early as 1977 the Supreme Court specifically stated that "[i]t is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds,* 430 U.S. at 821, 97 S.Ct. at 1494. As detailed above, subsequent lower federal court decisions, nearly all of which were rendered prior to the relevant time-frame of the present lawsuit, have made clear that the *Bounds* requirement—that prisoners be provided with "adequate law libraries or adequate assistance from persons trained in the law"—means that where prisoners are not afforded direct physical access to an adequate law library, they must have access to assistance from persons with legal training. Thus, even a cursory review of the preexisting constitutional law demonstrates the unconstitutionality of such a policy as the one challenged here. Accordingly, the defense of good faith immunity is not applicable. *See, e.g., Blake v. Berman,* 598 F.Supp. 1081, 1084 (D.Mass.1984).

### Damages

The plaintiff seeks both compensatory and punitive damages. Such relief should be denied. No injunctive relief was requested.

■ As the Supreme Court has recently observed, " 'the basic purpose' of § 1983 damages is 'to *compensate persons for injuries* that are caused by the deprivation of constitutional rights.' " *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 306, 106 S.Ct. 2537, 2543, 91 L.Ed.2d 249 (1986) (*quoting Carey v. Piphus,* 435 U.S. 247, 254, 98 S.Ct. 1042, 1047, 55 L.Ed. 2d 252 (1978)) (emphasis supplied by the *Stachura* Court). The Court further noted that "compensatory damages may include not only out-of-pocket loss and other monetary harms, but also such injuries as 'impairment of reputation ..., personal humiliation, and mental anguish and suffering.' " *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543 (*quoting Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3012, 41 L.Ed.2d 789 (1974)). However, the plaintiff's suggestion to the contrary aside, compensatory damages cannot be awarded merely because of some abstract notion that the constitutional right which has been violated is somehow "important" or "valuable." *Stachura,* 477 U.S. at 310, 106 S.Ct. at 2545.[24] In order to recover substantial compensatory damages, actual injury must be demonstrated. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052.

This requirement was not satisfied in the present case. As noted above, the plaintiff

---

**24.** Plaintiff's reliance, at p. 10 of his Closing Argument, upon *Herrera v. Valentine,* 653 F.2d 1220, 1231 (8th Cir.1981) does not help his case. The Supreme Court in *Stachura* expressed specific disapproval of *Herrera* as being one of several cases in which the circuit courts of appeal have acted improperly in upholding damage awards based upon the abstract value of the substantive constitutional rights in question. 477 U.S. at 304 n. 5, 106 S.Ct. at 2541 n. 5 *Herrera* is no longer good law on this point. *Harris v. City of Pagedale,* 821 F.2d 499, 505 n. 8 (8th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 504, 98 L.Ed.2d 502 (1987).

has demonstrated no actual prejudice which befell him as a result of his failure to obtain needed legal materials. He has further neither alleged nor demonstrated any actual physical or emotional injury, whether it be premised upon "mental anguish or suffering" or otherwise. The plaintiff has simply failed to demonstrate the sort of actual, provable injury necessary for compensatory damages. Therefore, only nominal damages are appropriate. *Stachura,* 477 U.S. at 308–09 n. 11, 106 S.Ct. at 2544 n. 11; *Carey,* 435 U.S. at 266, 98 S.Ct. at 1053.

■ Although a somewhat closer question, the plaintiff's request for punitive damages should also be denied. As the Court has observed, "[t]he purpose of punitive damages is to punish the defendant for his willful or malicious conduct and to deter others from similar behavior." *Stachura,* 477 U.S. at 306 n. 9, 106 S.Ct. at 2542 n. 9. For that reason, in order for the plaintiff to be entitled to punitive damages under § 1983, at a minimum he must demonstrate that the conduct of the defendant involved a "reckless or callous disregard" for his federally protected rights. *Smith v. Wade,* 461 U.S. 30, 51, 103 S.Ct. 1625, 1637, 75 L.Ed.2d 632 (1983).

In an effort to demonstrate bad faith on the part of defendant Dahm, the plaintiff relies upon the consent decree in the case of *Rust v. Gunter,* CV84–L–712 (D.Neb. 1986). In *Rust* a consent decree was entered on August 22, 1986 which primarily provided the death-row inmates of the Nebraska State Penitentiary with direct physical access to the law library.[25] Defendant Dahm testified that although he "possibly" may have become aware of this situation earlier, the first time he specifically recalls

seeing the actual settlement agreement was in February of 1987, during his deposition for the present case. In addition, he apparently saw the implications of that settlement result as somehow limited to the special situation of death-row inmates, and did not see it as indicating a change in policy for all inmates in various segregated statuses.[26]

Defendant Dahm further testified that in his opinion the policy of the LCC and DEC did not violate the segregated inmates' constitutional right of access to the courts. Although such inmates have been, and some continue to be, deprived of direct physical access to the law library, he testified that he thought it sufficient that legal materials are made available to them in their cells through inmate legal aides. On cross-examination, defendant Dahm admitted that he had done nothing to determine that the policy was constitutionally adequate; he had not consulted an attorney, nor had he read the Supreme Court's decision in *Bounds v. Smith, supra.* In fact, he testified that he had never before heard of the decision. Instead, he merely continued to implement the policy which had been put in place by his predecessor, Gary Grammer. He testified that he had no reason to doubt the constitutionality of the old policy, as he had been given no directions from the Director of the Nebraska Department of Correctional Services, Frank Gunter—and had received no advice from the Nebraska Attorney General's office—indicating that a change was needed.

Such an abdication of the exercise of his own responsibility indicates negligence approaching gross proportions on the part of defendant Dahm. However, this is not sufficient to satisfy the standard set forth in

**25.** Director Frank Gunter testified in this case that the only reason he entered into the consent decree was because the evidence demonstrated that legal materials requested by the death-row inmates were not being obtained on a timely basis, with some delays as long as sixty days.

**26.** For example, defendant Dahm testified that on December 15, 1986, a policy change was implemented by which the inmates housed in the protective custody unit of the Diagnostic and Evaluation unit of the LCC were permitted direct physical access to the law library. He

testified, however, that this change was not the result of the *Rust* consent decree, but instead undertaken after the reassessment of more pragmatic considerations. He testified that it became practicable to permit such direct physical access primarily due to (i) the resulting increase in the number of personnel and the efficiency of staffing after the old DEC and LCC were administratively combined into one institution, and (ii) because of the physical proximity of the new protective custody unit to the law library.

*Smith v. Wade, supra.* Under the evidence presented I am unable to find that defendant Dahm acted with the requisite "reckless or callous disregard" necessary to entitle the plaintiff to punitive damages. 461 U.S. at 51, 103 S.Ct. at 1637.

IT IS THEREFORE HEREBY RECOMMENDED, pursuant to 28 U.S.C. § 636(b)(1)(B), that judgment be entered as follows:

1. For the defendant Ferguson on all claims.

2. For defendant Dahm on plaintiff's "cruel and unusual punishment" and "equal protection" claims.

3. For the plaintiff and against defendant Dahm on plaintiff's "access to the courts" claim, and awarding plaintiff nominal damages of $1, costs, and attorney's fees from defendant Dahm in his individual capacity for the violation of plaintiff's rights.

4. Denying the plaintiff's request for punitive damages.

The parties are hereby notified that unless objection is made within eleven days after being served with a copy of this recommendation, they may be held to have waived any right they may have to appeal the court's order adopting this recommendation.