Robert WILLIAMS, Appellant,

v.

William D. LEEKE, Director, South Carolina Department of Corrections, Individually and in his official capacity, K. D. McKellar, Warden, Maximum Detention Retraining Center, J. D. Manship, Chief Correctional Supervisor, and J. R. Martin, Warden, Central Correctional Institution, Appellees.

George Golden BROWN, Appellant,

v.

Andrew J. WINSTON, Richmond City Sergeant, Jack Davis, Department of Corrections, Captain Deal, Medical Officer, Richmond City Jail, Lt. Allen, Medical Officer, Richmond City Jail, Lt. Adkins, Officer, Richmond City Jail, Lt. McWilliams, Officer, Richmond City Jail, Lt. Cowens, Officer, Richmond City Jail, Deputy Sergeant Boatwright, Officer, Richmond City Jail, Deputy Sergeant Taylor, Officer, Richmond City Jail, Deputy Sergeant Funds, Officer, Richmond City Jail, Appellees.

Gary Lee ARMSTRONG, Appellant,

v.

R. F. ZAHRADNICK, Warden, Virginia State Penitentiary, Appellee.

Earl Jerome HUGHES, Appellant,

v.

R. M. MUNCY, Superintendent, and M. Lewis, Lieutenant, Penal Officer, Appellees.

Nos. 75–1936, 77–1085, 77–1550 and 76–1770.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1977.

Decided Oct. 4, 1978.

K. K. Hall, Circuit Judge, concurred in part and dissented in part and filed opinion.

Michael L. Rigsby, Richmond, Va. (Goddin, Major, Schubert & Hyman, Richmond, Va., on brief), for appellants in 75–1936, 77–1085, 77–1550 and 76–1770.

Patrick A. O'Hare, Asst. Atty. Gen., Richmond, Va. (Anthony F. Troy, Atty. Gen. of Virginia, Richmond, Va., on brief), for appellees in 77–1550 and 76–1770.

Stacy F. Garrett, III, Deputy Commonwealth Atty., Richmond, Va. (Burnett Miller, III, Asst. Atty. Gen., Richmond, Va., on brief), for appellees in 77–1085.

Daniel R. McLeod, Atty. Gen. of South Carolina, Emmett H. Clair, Senior Asst. Atty. Gen. and Kenneth W. Moore, Staff Atty., Columbia, S. C., on brief), for appellees in 75–1936.

Before HAYNSWORTH, Chief Judge, and WINTER and HALL, Circuit Judges.

HAYNSWORTH, Chief Judge:

These consolidated cases from Virginia and South Carolina involve claims that prisoners were denied adequate access to legal materials by the states, and hence the right of access to the courts guaranteed them by *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). In all four cases the complaints were dismissed. In the cases of Williams, Hughes and Armstrong, we affirm the dismissal of the complaint. In the Brown case, we remand the case to the district court for further findings of fact.

I.

Williams is confined in the South Carolina Maximum Detention Retraining Center, a facility housing prisoners presenting the greatest security risks in the prison system. Prisoners confined in maximum security are not allowed access to a legal library. Rather, they are taken to a library cell where guards fetch law books requested by the prisoner. The maximum security system itself has only a meager library; however, if the inmate requests, guards will order books from the law library of the South Carolina Central Correctional Institute. The law library at the Central Correctional Institute has all the law books held by the library found constitutionally adequate in *Bounds.* Prisoners held in maximum security in South Carolina are allowed uninterrupted use of the library cell from 8:00 a.

m. to 3:00 p. m.; however, prisoners do experience a one to two week delay between the time they request access to the prison cell and the time they are granted access to it. Prisoners may also seek legal assistance in the preparation of appeals and *habeas corpus* petitions from a public defender's office and a law student-run prisoner assistance project funded by the state. State funds may not be used, however, in the preparation of claims for money damages.

Hughes and Armstrong are prisoners in the Virginia State prison system. Hughes has no access to a law library as a result of his confinement in maximum security. Armstrong has access only three times a month to a law library which, concededly, lacks some of the materials held by the North Carolina prison library approved in *Bounds.* However, under Virginia law, prisoners at a state prison may seek the appointment of a competent counsel to assist them "concerning any legal matter relating to their incarceration" if they do not already have a court-appointed lawyer. The state has assured this court at oral argument that notice of this right to seek the appointment of counsel is posted at all units of the state prison system.[1]

Brown, at the time his petition was filed, was a prisoner in the Richmond City Jail. The Richmond City Jail has a law library which the petitioner concedes was in all ways adequate for his needs. Access to the library is granted to prisoners, however, for only forty-five minutes at a time, three days a week. No research assistance is provided prisoners. The record is bereft of any indication as to the exact nature of the legal problem Brown wished to research. Apparently, Brown wished to make some complaint about the adequacy of the medical care provided him. Nor is there any

---

1. Virginia Code, § 53–21.2 provides in pertinent part:

"The judge of a court of record having jurisdiction in the trial of criminal offenses, in whose county or city the State Penitentiary, a prison farm or a unit of the Bureau of Correctional Field Units, is located, shall on motion of the Commonwealth's Attorney for such county or city, when he is requested to do so by the Superintendent of the State Penitentiary, of a prison farm or of a unit of the Bureau of Correctional Field Units, appoint one or more discreet and competent attorneys-at-law to assist indigent inmates therein confined regarding any legal matter relating to their incarceration . . . ."

finding in the record that prisoners in the Richmond City Jail have the right to seek appointment of counsel under Virginia Code § 53–21.2. Counsel for the city could not assure this court that prisoners at the jail did have a right to seek such assistance, nor could counsel tell the court whether or not notice of such a right, if it did exist, was posted at the jail.

## II.

The claims of appellants Hughes and Armstrong present no substantial difficulties. In *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), the Supreme Court made it clear that prisoners have no absolute right to any particular type of legal assistance. Under *Bounds,* the state is duty bound to assure prisoners some form of meaningful access to the courts. But states remain free to satisfy that duty in a variety of ways. Justice Marshall, writing for the Court, made it clear that states could meet their obligation by providing prisoners "with adequate law libraries *or* adequate assistance from persons trained in the law." 430 U.S. at 828, 97 S.Ct. at 1498. Virginia has chosen to meet its obligation to its prisoners by providing for a program of state-funded legal assistance to prisoners having potential claims arising from their incarceration. In practice, Virginia's system makes lawyers regularly available to prisoners for consultation and advice. So long as prisoners are notified of the availability of such counsel for consultation, the state's system adequately insures that prisoners will have their claims reviewed and presented to the courts. Of course, it is essential that prisoners be informed of the availability of state provided legal assistance, lest the statutory right become no more than a hollow shell. Here, however, such notice was given.

Williams' case presents a more difficult question. Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds.* Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful chance to explore the legal remedies he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult. Were Williams an ordinary prisoner, and had the state provided only a prison law library and allowed only the limited access to that library provided to Williams, we might well be disposed to find the state's effort constitutionally inadequate. But Williams was no ordinary prisoner. He was a known security risk. The state would be justified in taking steps to insure that Williams did not use his right of access to a library as a cover for smuggling contraband into his cell. Reasonable steps to preserve prison security during "library time" may certainly be justified in the case of maximum security prisoners. We need not reach the question of reasonableness of the steps taken here however, since South Carolina did not rely solely on the law library as a means of guaranteeing the right of access to the courts. Rather, South Carolina combined its law library program with state funded programs designed to provide trained legal assistance to prisoners contesting the legality or conditions of their confinement. It is true, as Williams contends, that these trained legal personnel could not represent prisoners in actions for money damages. However, we think this of no moment so long as some law library is also provided. A prisoner with a legitimate money damage claim for violation of his civil rights will likely find private counsel available on a contingent fee basis. A prison's law library, in turn, should enable the prisoner to discover the existence of such a meritorious claim and to bring it to the attention of counsel.

■ Finally, we hold that Brown's complaint does require further inquiry, since, on its face, it states a constitutional violation. We believe that meaningful legal research on most legal problems cannot be done in forty-five minute intervals.[2] As we noted earlier, one cannot expect prisoners to immediately turn to exactly the right case, or to immediately discover the proper legal avenue to explore in search of an answer to their problems. At the least, severe restrictions on library time can be justified only if trained research assistants are made available to guide the prisoner's research efforts. No such assistants were provided here.

The city has been unable to assure this court that some alternative to a proper library program has been provided inmates at the Richmond jail. It does not appear clearly from the face of Virginia Code § 53–21.2 that that constitutionally adequate program for supplying legal counsel to prisoners applies to inmates at the Richmond jail, nor can the city assure us that, even if the statute does apply to the jail, it has taken the necessary steps to notify jail prisoners of their right to seek counsel. If the statute does apply, and if adequate notice was provided Brown, he has no claim. On this record, however, these issues cannot be resolved, and a remand is in order.

One other fact must need be found by the district judge in order for Brown to prevail on his claim. We have noted that in most instances forty-five minutes of access to a library will be insufficient for research of a prisoner claim, and will thus result in a denial of the prisoner's right of access to the courts. Were this a class action claim, we would be disposed to find that the system at the Richmond jail, absent provision for the appointment of counsel, deprived prisoners of their right of access. Brown, however, makes only an individual claim of denial of the right. While forty-five minutes may be too short a time to research most legal claims, some claims are easily researched because of the simplicity of the legal issue involved, or because a single, readily discoverable case disposes of the contention. The claim Brown wished to research when he was allegedly denied his right of access might be one of such a simple nature. The burden, however, is on the state to show that, even if the system of access provided is not constitutionally adequate, that system nevertheless did not deny Brown his individual right of adequate access because of the simple nature of his claim.

■ We should not be understood to say that every small jail must have a law library, but misdemeanants serving sentences of up to 12 months in local jails should not be left wholly without resources to prosecute potentially valid habeas claims or claims challenging the conditions of confinement or the adequacy of medical care. The provision of a law library might be unreasonably expensive, but making available the services of a lawyer, advanced law students or even paralegals might be quite inexpensive and much more effective. We only hold that a prisoner in a city jail is entitled to reasonable access to the courts and that is not provided one serving a substantial sentence of confinement if, without other legal assistance, he has access only to

**2.** Counsel for the state suggested that the total amount of time Brown might have spent in the library during the course of a month equalled the amount of time North Carolina prisoners were allowed to spend in the library in *Bounds.* Brown, over the course of four weeks, would have been able to spend nine hours in the library. The North Carolina prisoners in *Bounds* were allowed, at the least, one full day in the library every month, a total of eight hours. However, the adequacy of access cannot be measured by mere calculation, since the question to be decided is whether a particular plan insures meaningful access to the courts.

The *Bounds* approved plan granted prisoners the opportunity to explore their legal problems over the course of a full day, thus giving them an uninterrupted opportunity to research their claims by rummaging through law books and by pursuing different avenues of research. The North Carolina plan provided trained legal assistants to aid this search. Brown, on the other hand, was allowed to research only in short intervals without guidance. Thus, his opportunity to do meaningful research was much more severely restricted than the *Bounds* prisoners. This is an instance where the quality of the access, and not the quantity, is significant.

a law library which is so restricted as to be unmeaningful.

*AFFIRMED AS TO APPELLANTS WILLIAMS, HUGHES AND ARMSTRONG.*

*REVERSED AND REMANDED AS TO APPELLANT BROWN.*

K. K. HALL, Circuit Judge, concurring in part and dissenting in part:

Because I think the district court's dismissal of each action was proper I must dissent from the majority's remand of Brown's case for two reasons. First, the majority has indiscriminately put an institutional duty upon city jails which has been imposed by the Supreme Court only upon state correctional facilities for prisoners serving long terms of incarceration. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Second, assuming that such an institutional duty should be imposed upon city jails, the majority is wrong, both in holding as a matter of law that the duty is not fulfilled by a plan which allows access to research materials in forty-five minute intervals, occurring almost every other day, absent the services of research assistants, and in its directions to the district court on remand.

### I.

In *Bounds v. Smith, supra,* the Supreme Court held that states have an affirmative constitutional obligation "to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." 97 S.Ct. at 1498. The issue before the Court was not the existence of an individual's right of access to courts which, without question, is a fundamental right of all persons whether incarcerated or free. Neither was the issue whether a person can be shut away from the watchful eyes of courts to suffer clear violations of established constitutional rights. Rather, the issue addressed was whether state penal facilities have an institutional duty, founded upon the fundamental right of access to courts, to make court review of the fact and condition of prisoners' incarceration more meaningful through *some* form of institutionally provided legal assistance in the preparation and filing of prisoner petitions.

The state's obligation considered in *Bounds* is an institutional one which is fulfilled as to all prisoners—even illiterate prisoners—by making legal research materials generally available to inmates in lieu of requiring legal counselling on an individual basis by lawyers or other persons with some legal training.

The issue before us in Brown's appeal is whether this same institutional duty should be imposed upon city jails and by implication upon all places of incarceration. The rule of *Bounds* does not require it, and I do not think we should impose it, particularly without an analysis of the principles underpinning that decision.

In *Bounds,* the Court characterized prisoner petitions as the "first line of defense against constitutional violations," and found that "[t]he need for new legal research or advice to make a meaningful initial presentation to a trial court" by prison inmates, particularly those with original actions seeking new trials, release from confinement or vindication of fundamental civil rights, is constitutionally significant. 97 S.Ct. at 1498. It was noted that "[w]ithout a library or legal assistance . . . inmates will not have a '*current* opportunity to present [their] claims fairly,' and valid claims will undoubtedly be lost." *Id.* at 1498 n. 16 (citations omitted). The Court found that providing legal assistance would serve the important rehabilitation interest of helping convince prisoners of the fairness of the legal system. Finally, the Court found, in effect, that imposing a duty of assistance upon the states would not create a significant economic burden upon state prison systems because nearly half of the States and the District of Columbia already had legal services programs and substantial funding could be obtained from the Law Enforcement Assistance Administration.

In *Bounds,* the district court had initially found that a constitutional violation existed, and thereupon had given prison authorities an opportunity to devise a plan to remedy that violation. The Supreme Court approved this approach, emphasizing that federal courts should not "sit as co-administrators of state prisons," *id.* at 1500, and that prison authorities must be given wide discretion in their development of plans to provide legal services, which discretion could include due consideration of economic factors involved in each alternative plan.

In *Bounds* the Supreme Court was considering North Carolina's plan for providing legal services to prisoners in her penitentiaries. The state's plan established regional libraries to serve the state's decentralized prison system. The district court agreed with prison authorities that most of the prison units were too small to require their own libraries and the cost of additional books proposed by the prisoner claimants would surpass their usefulness. *Id.* at 1494 n. 6. The library materials to be furnished under the state's plan were not extensive; they included state and federal statutes and case reporters (beginning with 1960 volumes), a criminal law reporter, a law dictionary, court rules and several treatises on criminal law and prisoner rights. *Id.* at 1493–94 n. 4. The state's plan contemplated an appointment system for prisoner use of the regional library facilities, with transportation and housing provided if necessary. Finally, the state indicated that it would train inmates as research assistants and typists to aid fellow prisoners. *Id.* at 1493–94.

The Supreme Court, on review, did not apply a cost-benefit analysis to establishment of the state's obligation, announcing that "the cost of protecting a constitutional right cannot justify its total denial." *Id.* at 1496. It did, however, approve the district court's economic analysis of the state's plan to implement its obligation, finding that the plan was " 'both economically feasible and practicable' and one that, fairly and efficiently run, would 'insure each inmate the time to prepare his petitions.' " *Id.* at 1494.

The Court concluded its analysis by emphasizing that

> while adequate law libraries are one constitutionally acceptable method to assure meaningful access to the courts, our decision here . . . does not foreclose alternative [measures] to achieve that goal. Nearly half the States and the District of Columbia provide some degree of professional or quasi-professional legal assistance to prisoners. . . . Such programs take many imaginative forms and may have a number of advantages over libraries alone. . . . Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly. . . . Nevertheless, a legal access program need not include any particular element we have discussed, and we encourage local experimentation. Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards. [Footnote omitted]

*Id.* at 1499–1500.

The Court did not address the issue of whether institutions which were maintained for short-term incarceration of misdemeanants serving sentences of one year or less would be subject to the same institutional duty to provide assistance to prisoners in preparation of court papers. Throughout the opinion the Court emphasized that its holding merely gave effect to its previous per curiam decision in *Younger v. Gilmore,* 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971). The Court did make reference to *Cruz v. Hauck,* 404 U.S. 59, 92 S.Ct. 313, 30 L.Ed.2d 217 (1971), in which a decision of the Fifth Circuit that legal materials need not be furnished to county jail inmates was vacated and remanded to it for reconsideration in light of *Younger.* In *Hauck,* after remand and on the third appeal, the Fifth Circuit found that the county jail under

scrutiny confined approximately 700 inmates, which made it comparable in size to many state prisons, and stated that because the jail assumed some functions served by the state penal system, it was under a duty to provide legal assistance to the prisoners. *Cruz v. Hauck,* 515 F.2d 322, 332–33 (5th Cir. 1975). It distinguished the duty owed to short-term inmates from that owed to long-term inmates on the basis of the time that prisoners are expected to stay in the jail without legal assistance, in that, the brevity of confinement might itself prevent prisoners' petitions from reaching the courts while those prisoners were still incarcerated. *Id.*

In similar vein, the key to our inquiry in Brown's case, or in any case involving prisoners' rights to institutionally provided legal assistance, is not whether each prisoner has assistance for his individual claims, but whether the general availability of legal assistance to the overall inmate population is so minimal that vindication of constitutional rights will necessarily be lost or frustrated by the fact of confinement itself. The majority implicitly acknowledges this in holding in Williams' case that South Carolina's interest in maintaining security permits diminution of the duty to provide legal assistance to some prisoners, and that no legal assistance is required for § 1983 claims for money damages.

In addition to those factors considered in *Hauck*—length of incarceration and number of prisoners housed in a penal facility—I would also consider the purposes of the facility and the inmates' access to court counsel as a matter of individual right in determining the extent of any institutional duty to provide legal assistance imposed upon lock-up facilities which are not used primarily for the incarceration of adults for periods in excess of one year.

In the usual city or county jail situation, inmates are misdemeanants serving sentences of one year or less. The very brevity of their incarceration belies a finding that depriving them of legal research materials while they are in jail will deny them meaningful access to the courts. Current opportunity to present claims is not destroyed by minimal delay in preparation and presentation. The inmates' right of access to the courts will not be substantially impaired by mere delay of access to research materials for six to twelve months; upon their release from custody they will have the same access to public libraries and legal assistance programs as do members of the general public. Absent a problem created by a very brief statute of limitations in a particular jurisdiction, there is no danger that valid claims will be lost.

Similarly, many if not most prisoners incarcerated in city and county lock-ups are currently before the courts as pre-trial detainees or on direct appeal. Since the constitutional right to counsel attaches during this period, such prisoners should be required to depend exclusively upon that counsel, whether appointed or retained, to represent all of their rights including those involving the current fact or conditions of incarceration. Denial of individual access to legal materials is not denial of right of access to courts where prisoners are represented by counsel.

Finally, some prisoners in short-term facilities are housed temporarily pending transfer to a long-term facility. Again, I see no denial of access to the courts in refusing temporary access to legal materials, when some form of legal assistance will be available when the prisoner is transferred.

The number of prisoners housed in any city or county facility is probative of whether that facility assumes some functions of a state penal institution—the situation in *Hauck.* If a jail or other short-term facility serves the function of a state prison system by incarcerating large numbers of persons for substantial terms in excess of one year without an individual right of court counsel, then the rule of *Bounds* should be applied to require those facilities to provide legal assistance as required in *Bounds.* But no institutional duty can be imposed on city and county lock-ups housing a small number of short-term prisoners without extending the reach of *Bounds* beyond its analyti-

cal limits, and without imposing a crushing economic burden on many cities and counties.[1]

In sum, I think the extent and nature of the institutional duty should be qualified by the purposes of the institutions under scrutiny, by the length of time that persons are subject to incarceration therein without legal assistance, and by the number of inmates who could reasonably benefit from legal services in the preparation of court papers. The duty should not be extended beyond that found necessary in *Bounds.* It should apply only to penal institutions which are used for the long-term incarceration of adults or to local jails detaining large numbers of persons serving substantial sentences without legal assistance.

One final consideration should be noted. This court has recently held, in *Gordon v. Leeke,* 574 F.2d 1147 (4th Cir. 1978) that a district court has the affirmative duty to assist a pro se petitioner by, *inter alia,* inquiring into key facts which may not have been alleged in the complaint to determine whether a colorable claim has been stated. After this threshold determination, the district court may appoint counsel to assist the petitioner in his case. *See Gordon v. Leeke,* 574 F.2d at 1154 and n. 3 (Hall, Circuit Judge, dissenting.) This duty of assistance imposed on the court has the correlative impact of lessening the importance to prisoners of access to legal research materials— particularly those whose collective need for institutionally provided legal assistance is much less compelling by virtue of their number, the length of their incarceration and the important fact, ignored by the majority, that attorneys are ever present in local jails representing inmates in criminal prosecutions and thus are generally availa-

ble and ethically required to provide *current* legal assistance to vindicate serious institutional deprivations of constitutional rights. In the instant case, Brown had access, albeit limited in time, to adequate research materials; he was able to have his claims presented to a court, which court had the duty to assist him in that presentation. To hold, as the majority does, that Brown was denied his constitutional right of meaningful access to the courts defies logic.

## II.

Even assuming as the majority does that the same duty imposed on state prisons should apply to city jails, we cannot hold on this record that the duty has not been fulfilled. Brown admits that the library materials provided by the Richmond City Jail are sufficient, and that he is allowed immediate access, almost every other day, to those materials. His sole objection is that the jail's scheduling system limits his research time to forty-five minutes per visit and that there is no research assistant in the library. The majority holds that these facts, standing alone, amount to a constitutional deprivation of the right of access to the courts and that Brown can maintain his action upon an allegation of prejudice which will in turn require the city to disprove that allegation.

Under the analysis of *Bounds,* this conclusion cannot stand. The jail has provided access to adequate library materials with an apparent priority given to the needs of short-term inmates for immediate access to library materials. Admittedly, there are no inmate library assistants as in the North Carolina plan in *Bounds.* Such a system is perhaps less flexible than one which should be used for institutions housing only long-

---

1. I would not impose *any* institutional duty upon jail facilities which are not primarily used for the long-term incarceration of persons who are otherwise without counsel. However, if it is necessary to extend the reasoning of *Bounds* to require facilities which have a substantial number of long-term inmates without counsel who could reasonably benefit from *some* legal assistance, I would limit it to a duty to make available generally, or individually, upon request—*in lieu of library materials or legal serv-*

*ices*—(1) a current selection of leading state and federal cases or treatises on both criminal law and prisoners' rights, (2) simple forms for the filing of habeas corpus petitions and § 1983 actions and state tort claims, along with stamped envelopes addressed to the local federal district court to be mailed without censorship, and (3) a copy of the state and federal criminal codes and all statutes of limitations for state and federal claims applicable to wrongs which might arise out of jail incarceration.

term inmates, but I think that it is sufficient on its face to fulfill any duty the jail owes to its short-term and transient inmate population for whose benefit the library has apparently been provided. In my view, the plan of the Richmond City Jail, viewed as a whole, passes constitutional muster, and I would affirm the dismissal of Brown's complaint.

However, assuming that the complaint was sufficient to state a cause of action, this case should be remanded for the district court to require Brown to amend his complaint to allege specific prejudice to him; to require jail officials to answer the allegation of prejudice and to set out in more detail the specifics of the jail's legal assistance plan and the needs of the inmates; and to then determine either on motion for summary judgment or after an evidentiary hearing, whether the plan is constitutionally sufficient. In making this determination, the district court should be mindful of the admonition of *Bounds* that jail authorities are to be given wide discretion in their development of plans to assist prisoners in preparing and filing court papers. Any plan must then be evaluated as a whole, with proper consideration given to the needs of the inmates and the economic realities faced by jail officials, to determine its compliance with constitutional standards. If the district court determines that the plan is sufficient, the inquiry is at an end. If the plan is inadequate, then the court must determine whether Brown has carried his burden of showing that the plan prejudiced his own rights. As part of his burden I think he must show that he had no other legal assistance as a matter of individual right.

In conclusion, I would affirm dismissal of each action. In the case of Brown who was lodged in a city jail, I would affirm because local jail facilities which are not primarily used for long-term incarceration of adult criminal offenders should not be under an institutional duty to provide either library materials or legal services of the kind required in *Bounds,* and because even if they are under the same institutional duty, it has been fulfilled under the facts alleged in Brown's complaint. Alternatively, I would remand the case to the district court for that court to require an answer from the jail officials and then to consider whether the legal assistance plan, viewed as a whole with proper consideration given to inmate needs and economic factors, is constitutionally sufficient. Therefore, I must dissent.