**Allen KOERSCHNER, Petitioner,**

v.

**WARDEN, Nevada State Prison, et al., Respondents.**

No. 3:05–cv–00587–ECR–VPC.

United States District Court, D. Nevada.

Aug. 28, 2007.

Allen Koerschner, Lovelock, NV, pro se.

Jamie Resch, Nevada Attorney General's Office, Las Vegas, NV, for Respondents.

## ORDER

EDWARD C. REED, District Judge.

The Order (# 42), filed August 22, 2007, is amended to read as follows:

This habeas matter under 28 U.S.C. § 2254 comes before the Court on the petitioner's motion (# 29) for appointment of counsel, his supplemental motion (# 32) for appointment of counsel, and his motion (# 33) "for intervention," which also seeks appointment of counsel or, in the alternative, certain specified relief regarding the legal resources available at Lovelock Correctional Center ("Lovelock").

Petitioner's motions follow upon a recent policy change at Lovelock that eliminates direct physical access to the prison law library, for all inmates, and replaces such physical access instead with a "paging system," under which inmates can request a maximum of five specified legal materials at a time, and which operates together with limited assistance by other inmates. The minimum qualifications required to become an inmate legal assistant or law clerk under the policy is that the prospective assistant be able to read and write at a ninth grade reading level and have no disciplinary infractions in the preceding twelve months.

Petitioner also raises issues regarding the failure to update certain legal texts and the removal of typewriters. The Court does not reach these additional issues in light of the disposition reached herein.

### Background

The Court notes at the outset, as it will reiterate again subsequently in this order, that the only matter before the Court is a request for appointment of counsel by the petitioner in this habeas action. This is not a prison civil rights action. Although the Court will discuss the legal resources available in the prison, and further will discuss related legal principles and prison civil rights case law regarding the right of access to the courts, it does so solely in connection with a determination of whether the interests of justice require the appointment of counsel for this petitioner in this habeas action.

Against that backdrop, the record presented reflects the following.

Petitioner Allen Koerschner seeks to set aside his 1997 Nevada state conviction, pursuant to a jury verdict, for two counts of sexual assault with a minor. He is sentenced to two consecutive life sentences with the possibility of parole after ten years.

Koerschner currently is held in protective custody because of his conviction as a sex offender. It generally is necessary to

segregate sex offenders from other inmates for safety and security reasons.[1]

Respondents have submitted an affidavit by Robert L. LeGrand describing the policy change regarding law library access at Lovelock. LeGrand is the Associate Warden of Programs at Lovelock, and, as such, he is the direct supervisor for the Administrative Assistant IV who oversees the operation and administration of the prison law library.

According to LeGrand, Lovelock is "fairly unique to the NDOC system, as the yard is divided into multiple populations which include, General Population, three units of Protective Segregation, a Disruptive Group Management unit, and two Administrative Segregation units, all requiring separation from each other." LeGrand attests that "[t]his type of segregation is necessary to properly address the Department's safety and security issues posed by a large number of sex offenders, gang members, ex-gang members and other concerns all requiring segregation from other inmates." [2]

LeGrand attests that "[t]he arrangement of the housing units and the segregation requirements make it impossible to move inmates to a central location for a physical law library." He attests that, accordingly, Lovelock has changed over "to electronic searches and a request-driven system," and, subsequent to the changeover actually going into effect, "has been formulating their Institutional Procedure for law library operations." He notes that a draft has been created and currently is in the final approval process. He attaches a copy of the final draft to his affidavit.

The draft is presented as reflecting current operating practice.[3]

Petitioner has submitted a sworn declaration stating that, prior to the policy change, there was a satellite law library inside his protective segregation unit, Housing Unit 6, that could be physically accessed by the inmates within that segregated unit. According to Koerschner, the satellite library contained most of the required materials and books. However, he states that the satellite library in the unit was permanently closed in late 2006, and the hundreds of law books previously stocked therein were removed in June 2007.[4]

Respondents do not directly address why an alleged inability to move segregated inmates to a central law library required the elimination of a satellite library housed entirely within a segregation unit.

Section V(E) of the final draft provides for the following paging system:

2. Inmates may have up to five (5) materials (case law, reference, search results, books [in units where books are permitted], rules, regulations, laws, and other miscellaneous Westlaw print-outs) checked out and in their possession at one time.

  a. Legal materials described within this paragraph may be checked out for one consecutive three (3) day period of time only.

  b. Legal materials described within this paragraph may not be re-checked out on the same day they are returned, but may be requested again for check out one day

---

1. # 30, Ex. A, ¶ 2; # 36, Ex. B, ¶ 4. Respondents assert that the declaration submitted with # 30 is "fully admissible under Nevada law [under] NRS 53.045." # 36, at 4. In federal court, the admissibility of a sworn declaration instead is governed by 28 U.S.C. § 1746.

2. # 36, Ex. B, *LeGrand Affidavit,* ¶ 4.

3. *LeGrand Affidavit,* ¶¶ 5 & 7.

4. # 35, at 30–31.

after their return. This rule disallowing "rechecks" makes it possible for all inmates to use these materials.

3. Inmates will check out Law Library materials as described in Section V(E)(2) above by completing an "NDOC Law Library CD–ROM Case Law Print Requests" form, which will be available from unit staff and/or the Unit Assistant. An "Inmate Request Form," or "kite," may be used to request Law Library checkout materials ONLY when the print request forms are otherwise unavailable for use.

4. Inmates having any other legal needs or concerns, which cannot otherwise be addressed with the Supervisor or Unit Assistant should submit their needs or concerns on an appropriate form addressed to the Supervisor or Legal Assistant. The Supervisor or Legal Assistant(s) may respond to such request as conditions warrant, i.e. may take immediate action to address the need or concern, may conduct research (Section V[F][2][d] below), or may postpone the resolution of the matter until the Supervisor's or Legal Assistant's next visit to the requesting inmate's unit. If deemed necessary, the Supervisor may summons [sic] the requesting inmate to the Law Library for the addressing of the need with the Supervisor or Legal Assistant(s).

5. Except as may be otherwise allowed within other Sections of this Institutional Procedures, inmates must conduct all affairs relating to legal materials, legal copy work ... and legal supplies ... through and with the Unit Assistant assigned to their individual housing unit, during as-

signed days and hours for doing so . . . . .

# 36, Ex. B, *Final Draft of Institutional Procedures* ["*Final Procedures Draft*"], at 5–6.

It appears from the above-quoted Section V(E)(2), together with Section V(I)(1) of the policy, that an inmate, or at the very least an inmate such as petitioner in a segregated unit, may retain and review the legal materials ordered—including apparently even copies of case printouts—for only a maximum of three days. It further appears that the inmate must return the copies of the previously ordered items before he can order five more cases or other items. Section V(E)(2) defines "legal materials" as "case law, reference, search results, books [in units where books are permitted], rules, regulations, laws, and other miscellaneous Westlaw print-outs." Section V(E)(2)(a) provides that such legal materials may be checked out for only one consecutive three-day period, subject to later rechecks. And Section V(I)(1) provides:

> Inmates in segregated units will be allowed to retain I[sic] their person [sic] living area a maximum of five (5) legal materials (Section V(E)(2) above) for three (3) days and 14 pounds of legal papers. This rule excludes the possession of legal books in units in which the Law Library is not permitted to deliver books.

*Final Procedures Draft*, at 9. It thus would appear that an inmate in a segregated unit may not keep copies of legal cases for more than three days and may not have more than five research cases in his cell at one time.

Section III(c) of the policy provides for two types of inmate assistants pertinent to the present inquiry. The first type, "Legal Assistants," consists of "[i]nmates *assigned to the Law Library* performing research and providing the inmate popula-

tion with forms, reference materials and information." The second type, "Unit Assistants," consists of "[i]nmates *assigned to designated housing units/areas* assisting the inmate population *in the ordering and receiving of search requests, legal materials, forms, copy work, and supplies.*" [5]

Respondents assert in the briefing that "it is apparent from Exhibit 'B' that the training and competition for law clerk positions is [sic] extensive." [6] LeGrand, however, states only the following in his affidavit, without elaboration:

The inmate law library assistants receive individual training. They are paid well as inmate workers in the system, and there is great competition for their positions.

*LeGrand Affidavit,* ¶ 6.

The policy itself, in contrast to both of the foregoing statements, states only the following minimum requirements to be an assistant, in Section V(C):

C. Prospective assistants must meet the following minimum criteria:

1. Must bea [sic] least 9th grade level in reading and writing as reflected on NDOC intake educational testing scores or upon certification of a teacher in the institutional's [sic] Education Program that the inmate reads and writes at the 9th grade level or above.

2. Must be 12 months disciplinary free of any violations.

*Final Procedures Draft,* at 3. Exceptions to the above criteria, presumably further lowering the criteria in a given case, potentially may be approved in writing by the Associate Warden of Programs or his designee. Law library workers who are charged with a violation during their ten-

ure are suspended pending a final resolution of the disciplinary proceedings. *Id.,* at 3–4.

The Court was unable to locate any provision in the policy mandating that Legal Assistants or Unit Assistants have or obtain any legal training, extensive or otherwise.

The LeGrand Affidavit further states as follows with regard to the accessibility of assistants with the above minimum qualifications to Lovelock inmates:

The inmate law library assistants are assigned to spend each day in the housing units. There, *the inmates can freely talk with the law library assistants,* asking them questions about their litigations, requesting information packets, general research, etc.

The inmate law library assistants are also charged with completing legal research and providing litigation support. They are not required to draft, write, or type legal papers for other inmates.

*LeGrand Affidavit,* ¶¶ 8 & 9 (emphasis added).

The policy itself, in contrast, places substantial restrictions both on inmates' physical access to assistants, particularly Legal Assistants, and on what assistance the assistants then actually can provide, particularly for an inmate such as petitioner, who is housed in a protective segregation unit.

Even in a general population housing unit, the Legal Assistants do not meet directly with inmates requesting legal assistance. Rather, under Section V(E)(1)(a), it is the Unit Assistant in the housing unit who meets with the Legal Assistants "for the purpose of acquiring and dropping off materials as ordered from the Law Library by the units' inmate population." [7]

---

5. *Final Procedures Draft,* at 2–3 (emphasis added).

6. # 36, at 6.

7. *Final Procedures Draft,* at 4. See also *id.,* at 6 (under Section V(F)(2)(b), Legal Assistants' duties include making "regular scheduled vis-

In a protective segregation unit, such as petitioner's unit, the Legal Assistants do not appear to interact freely even with the Unit Assistant. Section V(E)(1)(b) provides:

> PROTECTIVE CUSTODY/SEGREGATION units will operate under the same system set forth in Section V(E)(1)(a) above, i.e., each unit will have an assigned Unit Assistant, with General Population Legal Assistants making unit visits for the purpose of acquiring and dropping off materials. There will be no physical contact' allowed between the Protective Custody/Segregation unit assistants and General Population legal assistants; however, communication may be allowed in a manner proscribed [sic] by staff.

*Final Procedures Draft*, at 4.

To be sure, the policy provides under Section V(E)(1)(a) that inmates can speak with the Unit Assistant, "during such hours as deemed necessary by the Supervisor for meeting the needs of each specific unit, Monday through Friday, excluding holidays or such days as safety or security needs of the institution preclude such availability." [8]

The assistance that a Unit Assistant may provide in any such face-to-face talks with an inmate, however, is circumscribed under Section V(F)(4) of the policy:

4. The duties of a Unit Assistant are as follows:

a. Assisting other inmates in the identification of needed legal reference materials and/or assisting them in the clear articulation of their legal concerns to be submitted to the Law Library via print request forms.

b. Be available to the inmates within their assigned unit as per Section V(E)(1) above, for the processing of requests for supplies, legal copy work and legal materials, including taking requests for and delivering such items to the appropriate inmates.

c. Exchange legal materials with the Legal Assistant, as Sections Sections V(E)(1) and V(F)(2)(b) above, and consult with the legal assistant towards the addressing of any and all issues, questions or concerns, which arise.

d. Assist inmates with the disciplinary process, in accordance with procedures outlined in Administrative Regulation # 707.

e. Unit assistants may also provide assistance in the areas set forth in Section V(F)(2(d)(I) through (v) above [including, *inter alia*, postconviction procedures and cases challenging conditions of confinement] *only* when an inmates [sic] access to the courts would be effectively denied without the Unit Assistant's assistance *and the Unit Assistant is able to adequately address the matter.* Otherwise, the Unit Assistant should refer the matter to the Legal Assistant(s).

f. Any other such work as the Supervisor may direct.

*Final Procedures Draft*, at 8 (emphasis added). The policy does not appear to elaborate as to who determines when the exception regarding assistance in postconviction and prison civil rights matters under subparagraph (e) applies, what steps the inmate must take to invoke the exception, or how long it may take to secure a determination as to whether the exception

its, as per Section V(E)(1) above, for the exchanging of legal materials and consultation *with Unit Assistants* ")(emphasis added).

8. *Final Procedures Draft*, at 4.

may be invoked. The fact that such assistance is available only on an exceptional basis necessarily signifies that such assistance is not generally available to inmates. Moreover, the policy clearly presupposes that not all Unit Assistants in all units will be able to adequately address such matters themselves.

The assistance that a Legal Assistant may provide, via indirect communication with an inmate via, in protective segregation, restricted communication with a Unit Assistant, similarly is circumscribed under Section V(F)(2) of the policy. Legal Assistants, via the indirect communication route outlined above, assist other inmates "in obtaining legal reference material and performing whatever research is necessary" and "[m]ake regularly scheduled visits . . . for the exchanging of legal materials and consultation with Unit Assistants." They may provide assistance in, *inter alia,* postconviction matters, issues dealing with warrants and detainers, and litigation challenging conditions of confinement "only when an inmate's access to the courts would be effectively denied without the inmate Legal Assistant's assistance." [9] As with the similar provision restricting assistance by Unit Assistants only to exceptional cases, the policy does not appear to elaborate as to who determines when the exception regarding assistance in postconviction and prison civil rights matters applies, what steps the inmate must take to invoke the exception, or how long it may take to secure a determination as to whether the exception may be invoked. Moreover, again, the fact that such assistance is available only on an exceptional basis necessarily signifies that assistance by Legal Assistants—over and above responding to requests for legal materials and research in postconviction and prison civil rights matters—is not generally available to inmates.

To this Court, these multitudinous restrictions on access to and the function of the differing types of legal assistants seem a far cry from the picture suggested in the covering affidavit of inmates "freely talking" with an "extensively" trained legal assistant, much less one who actually works inside the law library where the actual legal resources are housed. Rather, the inmate can only speak with and forward a request for legal materials or research via an inmate who works in his unit to an inmate who works in the law library, and, in protective segregation, the interaction between the housing unit inmate and the law library inmate additionally is restricted.

Koerschner and two other inmates have provided sworn declarations and supporting exhibits reflecting their experiences under the new policy. These declarations have not been specifically contested or controverted by the respondents, and much of the content of their declarations is corroborated by the provisions outlined above.

According to the inmates, with the five item limit under the paging system, if the inmate orders five printed computer-generated cases or other items on Monday and receives them on Tuesday, he must return them to the "runner" on Wednesday to be able to receive five more items on Thursday. If he returns those five items to the runner on Friday, he will not receive any additional materials until the following Monday. He accordingly can obtain only ten to possibly fifteen cases or other items per week. A photocopied page from a Shepard's Citations volume counts as one item against the five item total.[10]

**9.** *Final Procedures Draft,* at 6–7.

**10.** # 35, at 31 & 40; see also *id.,* at 24, Exhibit 2.

The prison law library now uses a CD–ROM system for case law. According to the inmates, the system can only access specific cases requested, but they cannot retrieve cases by their Westlaw or Lexis case number. The inmates have no direct access to the CD–ROM system in the library but instead may request cases and materials only through the "paging" or "runner" system. The inmate must know the specific case number or specific citation of any other materials to be reviewed, and, at least in the protective segregation housing unit, inmates are not permitted access to volumes of the Pacific Digest, Federal Reporter, Federal Supplement or United States Supreme Court Reporter in book form.[11]

According to the inmates, the Lovelock law library is constantly running out of ink for the printer and toner for the photocopier, which necessarily would delay responses to requests for cases printed from the CD–ROM system.[12]

According to Koerschner, his housing unit "has one law clerk or legal assistant or 'runner' for 168 prisoners, [and the runner] . . . has a very limited knowledge of the law, legal theory, or complex concepts of law." He maintains that "[t]he law clerks or legal assistants have no formal training in the law." They are given a test to determine who gets the job, and the qualifications usually require that the prospective assistant be free of disciplinary charges for twelve months, work well with staff and inmates, and have a minimal level of knowledge of the materials contained in the law library.[13]

Inmate Kenneth Friedman, who has employment background in the legal field as a non-attorney, relates that he has had difficulty obtaining legal materials through the paging system and inmate assistants. He states for example that he "had to repeatedly make my requests for simple shepardization of a criminal statute and gotten nothing in return after *waiting for days*, but for oddball questioning to me on unsigned notes [to] 'please explain your research dynamics' and subsequent responses of simply not filling my request (e.g. latest Shepards on N.R.S. 200.575) or constantly being given the *wrong materials* than what I had specifically requested." He states that this is "a common experience."[14]

Inmate Ricky Nolan, on the other hand, states that he has only a limited education and that he has been unable to prepare his own legal briefs without the assistance of the few inmates who have some knowledge of the law. He often does not know in advance what to request through the paging system, and he states that now he gets no help.[15]

Inmates further have no direct access to the law library to photocopy their confidential legal papers. They must give their papers to the "runner," who then delivers it to a law library photocopy assistant. The inmates submitting declarations in this matter are concerned that the other inmates are reading their confidential legal papers. The photocopies are returned "a few days" later, and the quality of the photocopies varies.[16]

---

11. *Id.*, at 32–33.

12. *Id.*, at 32 & 40–41.

13. # 35, at 32; see also *id.*, at 26, Exhibit 4.

14. *Id.*, at 34 & 36 (emphasis in original); see also *id.*, at 28, Ex. 6 (perhaps argumentative response to a legal materials request by Koerschner).

15. *Id.*, at 39–40.

16. *Id.*, at 32, 36–37 & 40.

### Governing Law

██ The Sixth Amendment right to counsel does not apply in habeas corpus actions. *See Knaubert v. Goldsmith,* 791 F.2d 722, 728 (9th Cir.1986). However, 18 U.S.C. § 3006A(a)(2)(B) authorizes a district court to appoint counsel to represent a financially eligible habeas petitioner whenever "the court determines that the interests of justice so require." The decision to appoint counsel lies within the discretion of the court, and, absent an order for an evidentiary hearing, appointment is mandatory only when the circumstances of a particular case indicate that appointed counsel is necessary to prevent a due process violation. *See, e.g., Chaney v. Lewis,* 801 F.2d 1191, 1196 (9th Cir.1986); *Eskridge v. Rhay,* 345 F.2d 778, 782 (9th Cir.1965).

### Discussion

In an October 4, 1995, unpublished decision in *Evans v. Hatcher,* No. 3:92–cv–00297–ECR, the undersigned addressed the constitutionality of a remarkably similar system at Ely State Prison ("Ely") that relied upon a paging system and essentially untrained inmate legal assistants to replace meaningful physical access to a prison law library for segregation unit inmates.[17]

In *Evans,* much like the current situation now at Lovelock following the elimination of the protective segregation unit satellite library, there were no satellite libraries in the Ely segregation units. The system at Ely, however, actually provided marginally more law library access than in the present case because a maximum of 15 inmates in a segregation unit of up to 71 inmates would be allowed to conduct research in the prison law library for one to two hours on one night a week. Otherwise, however, the Ely segregation inmates were relegated to conducting any legal research through requests for specific materials made to inmate law clerks, *i.e.,* through a "paging system." [18]

The Court first held that the marginal physical law library access provided, standing alone, was insufficient to provide inmates with a reasonable opportunity to conduct legal research in support of their claims. The Court noted in particular the rotation of access that necessarily would be required for all of the up to 71 inmates in a unit to ultimately have possible access on the one night allowed in a week for a maximum of 15 inmates in the unit.

The Court further concluded that the inmate assistance presented as an alternative to more meaningful physical access to the library similarly was lacking. The parallels to the present case are striking:

---

**17.** Petitioner specifically referenced this Court's prior decision in *Evans* in support of his motions in this matter. Petitioner did not attach a copy of the decision, perhaps due to difficulties and restrictions regarding, *inter alia,* his ability to make copies. Respondents indicate that the case was too old to be accessed electronically, and, thus, respondents "were not able to review this Court's entire decision in that case." # 36, at 5. The Court would note that all prior physical case files in closed cases that have not been imaged on the Court's electronic docketing system nonetheless remain public records that may be obtained via an archives order in a relatively short period of time with payment of a handling fee. This Court certainly does not disregard its prior decisions on an issue merely because they are not immediately available on the Court's latest electronic docketing system. The Court would note that it is ironic that the respondents seek to champion the paging system in this case as a constitutional manner of access for inmates but counsel apparently was stymied when a single prior decision of this Court—by the same presiding judge on substantially the same issue—was not immediately available and would have to be obtained via the Clerk.

**18.** *See Evans v. Hatcher,* No. 3:92–cv–00297–ECR, # 174, at 4–7.

Defendants vaunt a lengthy list of inmate "law clerks" along with their qualifications ... as evidence of the sufficiency of segregation prisoners' access to legal resources. But of the five clerks listed as assigned to the segregation units, three are described as "self-taught."

Inasmuch as the segregation inmates appear to have little regular access to the law library itself, Defendants apparently consider the assistance of two or three high school educated inmate law clerks sufficient to satisfy their constitutional obligation to provide meaningful legal help for the scores of segregation prisoners.

In fact, according to Plaintiffs, only one inmate law clerk is assigned to each segregation unit, each of which houses between 48 and 71 inmates.....

No. 3:92–cv–00297–ECR, # 174, at 7–8.

The Court then looked to the system as a whole, including the paging system implemented at Ely:

It is no longer capable of question that so-called paging systems[FN2] are inadequate under *Bounds v. Smith,* [430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977),] to provide segregation prisoners meaningful access to the courts. In *Toussaint v. McCarthy,* 801 F.2d 1080 (9th Cir.1986), the Ninth Circuit ruled that prison administrators fail to provide segregation inmates the access to legal resources required by *Bounds* when, for security reasons, they bar those inmates from the prison law library and relegate them to a paging system. The *Toussaint* court cited with approval the decision in the Fourth Circuit in *Williams v. Leeke,* 584 F.2d 1336 (4th Cir.1978) ... holding a paging system employed by a South Carolina maximum security facility unconstitutional:

Ordinarily, a prisoner should have direct access to a law library if the state chooses to provide a prison law library as its way of satisfying the mandate of *Bounds.* Simply providing a prisoner with books in his cell, if he requests them, gives the prisoner no meaningful change to explore the legal remedies that he might have. Legal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Toussaint,* 801 F.2d at 1109–10 (quoting *Williams,* 584 F.2d at 1339).

It is this court's impression that ESP's administrators, mindful of *Toussaint*'s disapproval of paging systems as the sole means of according inmates' *Bounds* rights, has supplemented ESP's paging system with a system of direct law library access so grudging as to be meaningless. In evaluating the constitutionality of administrative limits on prisoners' access to regulations, this court looks to substance, not form. Viewing ESP's system of restrictions on segregation inmates' access to law books and legal advice as a whole, this court finds it wanting.

[FN2] Paging systems allow prisoners to request specific volumes from the library, and to have such material delivered to their cells. As this Circuit has recognized, such systems require a prisoner to know in advance which volumes he needs to review. Even assuming the average prisoner litigant

encounters no difficulty directing the inmate law clerk or book runner to the precise volume of the Federal Reporter or United States Reports he needs, the delays occasioned by the paging system waste tremendous amounts of time and cause unnecessary frustration. *See Toussaint v. McCarthy,* 801 F.2d 1080, 1109 n. 30 (1986). No. 3:92–cv–00297–ECR, # 174, at 9–10 & n. 2.[19]

This Court's decision in *Evans* and the Ninth Circuit's *Toussaint* decision both predated the Supreme Court's decision in *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In *Lewis,* the Supreme Court emphasized, *inter alia,* that the Constitution does not guarantee inmates a right of access to a prison law library or to legal assistance as such, but instead guarantees a right of access to the courts. 518 U.S. at 350, 116 S.Ct. at 2179. As the high court stated, "[i]n other words, prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'" 518 U.S. at 351, 116 S.Ct. at 2180 (quoting *Bounds,* 430 U.S. at 825, 97 S.Ct. at 1496). The Constitution "guarantees no particular methodology but rather the conferral of a capability—the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." 518 U.S. at 356, 116 S.Ct. at 2182.

█ The core holding in *Bounds,* however, not only survived but indeed was reaffirmed in *Lewis.* It remains firmly established law that "'the fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law.'" *Lewis,* 518 U.S. at 346, 116 S.Ct. at 2177 (quoting *Bounds,* 430 U.S. at 828, 97 S.Ct. at 1498); *see also Lewis,* 518 U.S. at 356, 116 S.Ct. at 2182.

It is subject to substantial question whether the Lovelock procedures provide adequate assistance through either of the above means, and it further is subject to substantial question whether the procedures provide for adequate access to the courts when taken together.

With regard to a prison's use of a law library as one possible means of providing for access to the courts, *Lewis* does not appear to override the prior binding holding of the Ninth Circuit in *Toussaint* as well as the holding by this Court in *Evans* that a paging system, standing alone, fails to provide adequate assistance.[20]

The paging system now being employed at Lovelock arguably may be more restrictive and inadequate than those found constitutionally deficient in past cases. The policy not only limits an inmate such as

**19.** *See also Spann v. Garcia,* No. 3:92–cv–00646–ECR, 1993 WL 561012 (D.Nev. 1994)(Ely paging system did not satisfy the requirement of meaningful access to the courts where the inmate was not provided either physical access to a law library or assistance from a person trained in the law); *Spann v. Garcia,* 172 F.R.D. 418, 421 (D.Nev.1996)(referencing the prior holding regarding the paging system).

While the Court granted partial summary judgment on the issue of the constitutional inadequacy of the legal resources at Ely, the Court required that the plaintiffs demonstrate actual injury in order to obtain relief. The claims remaining in the case ultimately were settled before a trial as to actual injury.

**20.** *See also Trujillo v. Williams,* 465 F.3d 1210, 1226–27 (10th Cir.2006)(claim that "exact-cite" paging system resulted in a denial of access to the courts potentially stated a claim).

petitioner to five specifically identified cases or items per request, but it further provides that the inmate may not *keep* a printout of a case more than three days and may not have more than five cases or other legal materials in his cell at any time. Over and above the difficulty of knowing specifically what to request in advance, it would be exceedingly difficult for anyone, much less a lay inmate, to prepare and file meaningful legal papers to present constitutional claims under such restrictions on access to, retention, and use of supporting authority. Moreover, even for an inmate who knows what he needs to see in advance, he must attempt to convey his requests through and to persons who potentially have attained the reading level only of a freshman in high school. Worse yet, if the inmate does not know what specific citations or materials to ask for in advance, his only recourse is to ask for assistance from a person who may only have a ninth grade reading level and a clean recent disciplinary record as his qualifications, who then will ask another similarly "qualified" inmate in the not improbable event that he does not know the answer.

This Court accordingly has substantial doubts as to whether the paging system employed at Lovelock, standing alone, is constitutionally adequate as a method of providing assistance via a prison law library.

The Court further has substantial doubts as to whether the prison otherwise has provided constitutionally adequate as-

sistance, either in isolation or in combination with the paging system, via the means of providing "adequate assistance from persons trained in the law."

At the outset, the proposition that a person with minimum qualifications only of attaining a ninth grade reading level and of being free of disciplinary infractions for twelve months qualifies as a "person trained in the law" constitutes its own refutation.

Moreover, the Court has substantial doubts as to whether assistance restricted only to pulling cases and researching requested issues constitutes constitutionally adequate assistance in situations where the inmate's own functional law library access is circumscribed as in this case. Both *Bounds* and *Lewis* speak of providing assistance by persons trained in the law as an alternative means to providing a law library to adequately assist inmate court access. Quite arguably, where, as in the present case, there is no functionally significant law library access, something more in the nature of "active assistance" by persons with some actual meaningful training in the law may be required. *Cf. Lewis,* 518 U.S. at 360 n. 7, 116 S.Ct. at 2184 n. 7 (referring to alternative plans providing active assistance). The Lovelock policy provides for such active assistance only as the exception, not the rule. And even when the policy does provide such active assistance, it does so via an inmate who may only read at a ninth grade level and who has not been charged with a disciplinary infraction for twelve months.[21]

---

21. The LeGrand Affidavit additionally states that "[i]nmates may seek other general inmates to prepare legal papers for them." *LeGrand Affidavit,* ¶ 10. It is not clear whether the respondents seriously contend that the contingent possibility that an inmate may find a legally trained inmate in his housing unit satisfies the institution's constitutional obligation to provide meaningful access to the courts. The Court trusts that the adequacy of

constitutional protections at the institution does not hang by such a gossamer.

The Court is not necessarily persuaded by the respondents' argument that the statement in *Lewis* that "the Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research" establishes the adequacy of the assistance provided at Lovelock. *See* 518 U.S. at 360, 116 S.Ct. at

The Court therefore is not sanguine that the Lovelock procedures satisfy the minimum constitutional standard under *Bounds* and *Lewis* of providing adequate access to the courts by assisting inmates "in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." The Lovelock procedures quite arguably provide the appearance of both but the substance of neither.

The Court makes no broad, definitive holding of unconstitutionality herein, however, as the ultimate question before the Court at present concerns only the possible appointment of counsel in this habeas matter.

■ Respondents urge that petitioner must demonstrate actual injury in order to obtain such relief. However, as the respondents themselves have emphasized, this is a habeas matter, not a prison civil

rights action. It is this Court's charge under 18 U.S.C. § 3006A(a)(2) to appoint counsel when "the interests of justice so require," not merely passively to wait for actual constitutional injury first to fully manifest itself, possibly months or years into an ongoing habeas case.

■ In the present habeas case, on the showing made, the Court finds that the interests of justice warrant the appointment of counsel, in light of the serious, and potentially constitutionally suspect, limitations placed on the petitioner's access to the courts, the presence of nonfrivolous claims, and the overall complexity of the case and issues presented.[22]

The Court further informs respondents that the undersigned will view the presence of similar limitations on access to legal resources as a strong factor weighing in favor of appointment of counsel in other habeas cases before this Court that pres-

---

2184. Nor is the Court necessarily persuaded by the respondents' reliance on *Madrid v. Gomez*, 190 F.3d 990, 995 (9th Cir.1999), which concerned statutory limits on attorney fee awards in prison civil rights litigation.

**22.** The Court finds that petitioner, while able to pay the filing fee, is financially eligible. The Court makes no implicit holding that an evidentiary hearing is required as to any claim or issue, that all of the claims are nonfrivolous, or that the petition or claims therein may not be subject to viable procedural defenses.

The Court further does not reach the issues presented regarding the removal of typewriters or the adequacy of the books contained in the law library and/or their updates.

With regard to the typewriter issue, the Court in any event defers to the adjudication of the pending declaratory judgment action on this issue in *State of Nevada ex rel Nevada Department of Corrections v. Cohen*, No. 3:07–cv–00266–LRH–RAM.

With regard to the adequacy of the law books and updates, the Court notes, on the one hand, that comprehensive general law resources such as, in particular, the Federal

Practice Digest, the United States Code Service, and the entire United States Code Annotated (USCA) are not constitutionally required for a prison law library. *See, e.g., Lewis,* 518 U.S. at 354–55, 116 S.Ct. at 2181–82. The only tools required "are those that the inmates need in order to attack their sentences, directly or collaterally, and in order to challenge the conditions of their confinement." 518 U.S. at 355, 116 S.Ct. at 2182. On the other hand, the sworn declaration of Megan McClellan submitted with # 30 lacks some clarity and specificity as to precisely what is contained in the library. It is not clear, for example, whether the Lovelock library contains a currently updated USCA volume for Section 2254. Respondents supplied a much more clear and detailed affidavit in *Olausen v. Director, Nevada Department of Corrections,* No. 3:06–cv–00069–PMP–VPC, at # 43, Ex. 5, for the Ely law library. Particularly in light of the substantial contrast between the statements in the LeGrand Affidavit and the documentation attached thereto, the Court would be reluctant to fully resolve any question as to the minimal constitutional adequacy of the physical law library on the only partially specific declaration provided.

ent nonfrivolous claims and that potentially may proceed to service of the petition.

IT THEREFORE IS ORDERED that petitioner's motion (# 29) for appointment of counsel, his supplemental motion (# 32) for appointment of counsel, and his motion (# 33) "for intervention" all are GRANTED to the extent consistent with the remaining provisions of this order. The grant of the motion for intervention, in particular, consists only of a grant of the petitioner's request therein for appointment of counsel. The counsel appointed will represent petitioner in all federal proceedings related to this matter, including any appeals or *certiorari* proceedings, unless allowed to withdraw.

IT FURTHER IS ORDERED that the Federal Public Defender for the District of Nevada shall have thirty (30) days to undertake direct representation of the petitioner or to indicate to the Court its inability to represent the petitioner in these proceedings. If the Federal Public Defender is unable to represent petitioner, the Court then shall appoint alternate counsel.

IT FURTHER IS ORDERED that, if the Federal Public Defender is able to represent petitioner and files a notice of appearance herein, counsel shall state in the notice of appearance the time believed to be necessary to prepare and file an amended petition, taking into account the anticipated investigation and other steps necessary for preparing the pleading. A deadline for the filing of an amended petition will be set after counsel has filed a notice of appearance, in the order confirming the specific appointment.

IT FURTHER IS ORDERED that, upon return of the file by the staff attorney, the Clerk of Court shall copy # 174 from *Evans v. Hatcher*, No. 3:92–cv–00297–ECR, shall file same as a Supplemental Court Exhibit in this matter, and shall send a copy to the parties.

The Clerk of Court shall send a copy of this order to respondents' counsel, the Federal Public Defender, petitioner, and the CJA Coordinator for this Division.